No. 103,111

STATE OF KANSAS, *Appellee*, v. JAMES A. MOSSMAN, *Appellant*.

(281 P.3d 153)

Opinion filed July 27, 2012.

*Matthew J. Edge*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Natalie A. Chalmers*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: James A. Mossman appeals from the imposition of lifetime postrelease supervision following his conviction of aggravated indecent liberties with a child. He contends lifetime postrelease supervision constitutes cruel and/or unusual punishment and violates § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. We reject Mossman's arguments, concluding the sentence is not disproportionate to the seriousness of his crime, is not grossly disproportionate to the sentences imposed for other crimes in Kansas or similar crimes in other states, and is not categorically unconstitutional. Consequently, we affirm his sentence.

## FACTS AND PROCEDURAL BACKGROUND

Mossman entered a no contest plea to one count of aggravated indecent liberties with a child, in violation of K.S.A. 21-3504(a)(1), a severity level 3 person felony, and one count of possession of cocaine, in violation of K.S.A. 65-4160(a), a drug severity level 4 felony. At the plea hearing, the State offered the following factual basis for the count of aggravated indecent liberties. In the fall of 2008, Mossman, who was 25 years of age, moved in with the family of the 15-year-old victim. The victim's stepfather was Mossman's friend and coworker and "allowed" Mossman to stay with the family. The victim disclosed in a SafeTalk interview that, "beginning on December 10th of 2008 and for sometime thereafter, she had a sexual relationship with the defendant, including penile/vaginal intercourse." Based on this factual proffer and after determining Mossman's plea was knowingly and voluntarily made, the district court accepted Mossman's plea and found him guilty.

Prior to sentencing, Mossman filed two motions. In one, he requested a dispositional departure. In the second, he argued that the imposition of lifetime postrelease supervision, which is statutorily mandated for a conviction of aggravated indecent liberties under K.S.A. 22-3717(d)(1)(G), is disproportionate and, therefore,

cruel and/or unusual punishment prohibited by § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution.

Mossman's constitutional argument was based on the statutory scheme that governs lifetime postrelease supervision and its corresponding conditions. He contended the mandatory nature of the sentence, the restrictions that accompany the supervision, and the potential for being reimprisoned for life if conditions are violated make the sentence unconstitutional. To support these arguments, Mossman noted that K.S.A. 22-3717(d)(1)(G) provides that an individual convicted of a sexually violent crime committed on or after July 1, 2006, who is released from prison "shall be released to a mandatory period of postrelease supervision for the duration of the person's natural life." An individual sentenced to lifetime imprisonment under K.S.A. 21-4643 is excepted from this requirement. Included in the definition of sexually violent crimes is the crime of aggravated indecent liberties with a child, one of Mossman's crimes of conviction in this case. See K.S.A. 22-3717(d)(2)(C).

Mandatory lifetime postrelease supervision includes a general requirement that the person cannot commit a new criminal offense and may include several other specific "conditions targeted toward facilitating rehabilitation, restitution, and safe reintegration into society. [Citation omitted.]" *State v. Gaudina*, 284 Kan. 354, 359, 160 P.3d 854 (2007). These conditions may include payment of costs, fines, and restitution; completing educational requirements; performing community service; reporting to a supervising officer; and abiding by other special conditions allowed by administrative regulations and orders. K.S.A. 21-4703(p) (defining "postrelease supervision"); K.S.A. 22-3717(m) (listing possible conditions). In addition to discussing these general conditions, Mossman, in his motion, stressed the potential of life in prison if he violates his postrelease conditions by committing a new felony. See K.S.A. 75-5217(c) ("upon revocation [of postrelease supervision], the inmate shall serve the entire remaining balance of the period of postrelease supervision"). Both the restrictions that accompany lifetime postrelease supervision and the potential for life in prison, Mossman argued in his motion, make the sentence disproportionate.

The district court conducted an evidentiary hearing on Mossman's motions at which Mossman presented the expert testimony of Dr. Mitchell Flesher, who was both a psychologist with the Kansas Department of Corrections and a private practitioner. Dr. Flesher testified he routinely performs "risk assessment evaluations for inmates who are being considered under the Sexually Violent Predator Act or those inmates who are being considered for parole" and had performed an assessment of Mossman. Although Dr. Flesher found some assessment factors were in Mossman's favor, he recommended Mossman participate in sexual offender and drug abuse treatment programs. After considering the evidence and the arguments of counsel, the district court applied the three-part test established in *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978), and concluded the lifetime postrelease supervision requirement "is constitutional as it applies in this case."

At sentencing, the district court denied Mossman's motion for a dispositional departure and imposed concurrent presumptive prison terms. The court also imposed lifetime postrelease supervision on Mossman's aggravated indecent liberties conviction as required by K.S.A. 22-3717(d)(1)(G).

On appeal, Mossman renews his argument that lifetime postrelease supervision constitutes cruel and/or unusual punishment under § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. This court transferred the case from the Court of Appeals pursuant to K.S.A. 20-3018(c) (transfer on court's own motion). At the time of the transfer and in light of Mossman's challenge under the Eighth Amendment's ban on cruel and unusual punishment, this court directed the parties to file "supplemental briefs addressing whether the categorical analysis set out in *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), which was decided after [Mossman's] briefs were submitted, should apply."

Perhaps because of the timing and nature of the request for additional briefing, the parties have addressed the analysis under the Kansas Constitution separately from the analysis under the United States Constitution. As a result, we will follow the same approach.

## § 9 OF THE KANSAS CONSTITUTION BILL OF RIGHTS

We first turn to Mossman's argument that his lifetime post-release supervision sentence, mandatory under K.S.A. 22-3717(d)(1)(G), violates § 9 of the Kansas Constitution Bill of Rights because the sentence is disproportionate. As we have discussed, Mossman raised this issue before the district court and the district court made findings related to the issue. Thus, we are able to decide the issue in this appeal, as opposed to past cases where the issue was raised on appeal but was not determined because the record was inadequate or the issue had been waived. See, *e.g.*, *State v. Naputi*, 293 Kan. 55, 67-68, 260 P.3d 86 (2011).

*Standard of Review*

"Ordinarily, constitutional challenges to a statute raise questions of law subject to unlimited appellate review. [Citation omitted.]" *State v. Seward*, 289 Kan. 715, 718, 217 P.3d 443 (2009). However, in deciding whether a sentence is cruel or unusual under § 9 of the Kansas Constitution Bill of Rights, a district court must make both legal and factual determinations. See, *e.g.*, *State v. Ortega-Cadelan*, 287 Kan. 157, 160, 194 P.3d 1195 (2008). When a district court's decision is appealed, an appellate court applies a bifurcated standard of review: All of the evidence is reviewed, but not reweighed, to determine if there is sufficient support for the district court's factual findings, and the district court's legal conclusions drawn from those facts are reviewed de novo. *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 (2009); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007).

Here, K.S.A. 22-3717(d)(1)(G) mandates lifetime postrelease supervision for a conviction of aggravated indecent liberties with a child, and thus an attack on the sentence is an indirect attack on the constitutionality of the statute as applied. Both a district court making the initial determination regarding whether a statute is constitutional and an appellate court conducting a review of that determination are required by the separation of powers doctrine to presume the statute is constitutional. Consistent with this presumption, if there is any reasonable way to construe a statute as constitutional, courts have the duty to do so by resolving all doubts

in favor of constitutionality. *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009); see *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 562, 186 P.3d 183 (2008) ("It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution.").

Another consideration under the separation of powers doctrine is the justiciability doctrine that constrains the exercise of judicial power. Among other things, this doctrine requires that issues be ripe before they can be considered by a court. *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 891-92, 179 P.3d 366 (2008). In this case, the State raises a question of ripeness and, in doing so, focuses on whether we can consider the potential that Mossman could violate his postrelease supervision conditions and be punished for those violations, perhaps by being sent to prison for life. The State points out that it is not known what conditions will be imposed when Mossman is released from prison and we cannot know if Mossman will ever violate postrelease supervision conditions or, if he does, what the laws in effect at that time will say about the potential punishment. While we will discuss the specifics of that argument in more detail, we conclude Mossman's general arguments regarding lifetime postrelease supervision are ripe for decision in this direct appeal from his sentencing.

We base this decision on two considerations. First, lifetime postrelease supervision is undeniably part of a defendant's sentence. K.S.A. 21-4704(e)(2) ("In presumptive imprisonment cases, the sentencing court shall pronounce the complete sentence which shall include . . . the period of postrelease supervision."); see *Martin v. Kansas Parole Board*, 292 Kan. 336, Syl. ¶ 1, 255 P.3d 9 (2011). Second, even if the exact conditions of Mossman's postrelease supervision are unknown and even if it is not known whether Mossman will be reimprisoned after being released on postrelease supervision, it *is* known that he will not enjoy all of the rights and privileges of an individual who is not supervised and will have to comply with some restrictions on his freedom. In other words, he will still be under a sentence when he is on postrelease supervision. Consequently, Mossman's argument that his sentence

is unconstitutional is ripe, at least for purposes of raising an argument that being subject to supervision for life is cruel or unusual punishment.

Consequently, we will address the specifics of Mossman's arguments under § 9 of the Kansas Constitution Bill of Rights.

Freeman *Factors*

In *Freeman*, this court recognized: "Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." *Freeman*, 223 Kan. at 367. This court set out a three-part test to aid in administering this principle, stating:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." *Freeman*, 223 Kan. at 367.

Accord *State v. Levy*, 292 Kan. 379, 384-85, 253 P.3d 341 (2011); *State v. Reyna*, 290 Kan. 666, 689, 234 P.3d 761, *cert. denied* 131 S. Ct. 532 (2010); *State v. Mondragon*, 289 Kan. 1158, 1162-63, 220 P.3d 369 (2009).

No one factor controls. "Ultimately, one consideration may weigh so heavily that it directs the final conclusion," but "consideration should be given to each prong of the test." *Ortega-Cadelan*, 287 Kan. at 161. Particularly where the focus of an argument is proportionality, "the factual aspects . . . are a necessary part of the overall analysis." *Ortega-Cadelan*, 287 Kan. at 161; *cf. Graham*, 130 S. Ct. at 2022 (only if a threshold comparison of the gravity of the offense and the severity of the sentence leads to an inference that the sentence is grossly disproportionate does a court engage

in comparative analysis). Further, this court has stated that the *Freeman* test will not apply " 'where the method of punishment, rather than the length of a sentence, is challenged as cruel or unusual.' " *State v. Kleypas*, 272 Kan. 894, 1032-33, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd on other grounds Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006) (quoting *State v. Scott*, 265 Kan. 1, 9, 961 P.2d 667 [1998]).

• *First* Freeman *Factor*

Considering the first *Freeman* factor—nature of the offense and the character of the offender—the district judge in this case found Mossman had committed "a serious offense." The judge then stated: "I have examined, [Mossman's] overall character, he is impulsive and can't control those impulses. He has been—I think Dr. Flesher points out some of the school issues and some of the rebelliousness, the drug use, the consistent acting out." Based on these individual characteristics, the judge concluded Mossman's sentence was not disproportionate.

The judge's conclusion regarding the seriousness of the crime is consistent with statements made by other courts that have rejected the argument that a lengthy sentence for a sex crime against a minor is cruel and unusual punishment. These courts recognize that sex offenses against minors are "considered particularly heinous crimes." *People v. Dash*, 104 P.3d 286, 293 (Colo. App. 2004). Further, it is generally recognized that society has a penological interest in punishing those who commit sex offenses against minors because they "present a special problem and danger to society" and their actions produce " 'particularly devastating effects' " on victims, including physical and psychological harm. *State v. Wade*, 757 N.W.2d 618, 626 (Iowa 2008) (quoting *In re Morrow*, 616 N.W.2d 544 [Iowa 2000]). The State's vital interest in protecting minors from sex activities explains the legislative decision to treat sex crimes against minors as a forcible or violent felony even if no physical force is involved. *Wade*, 757 N.W.2d at 626. Additionally, there are "grave concerns over the high rate of recidivism among

convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is 'frightening and high.'" *Smith v. Doe*, 538 U.S. 84, 103, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003) (quoting *McKune v. Lile*, 536 U.S. 24, 34, 122 S. Ct. 2017, 153 L. Ed. 2d 47 [2002]); see *Wade*, 757 N.W.2d at 626. These views are consistent with the Kansas Legislature's decision to treat sex crimes against minors, including the crime committed by Mossman, as "sexually violent" and deserving of lifetime post-release supervision.

To counter these general views and in an attempt to minimize the serious nature of this crime, Mossman makes two arguments. In one he suggests, as he did in his motion before the district court, that he engaged in "consensual sexual acts" with the 15-year-old victim and that he did not "force" the victim to participate or "harm her in any violent way." He points to the victim's statement that she encouraged Mossman's behavior.

These arguments are not convincing. Sexual intercourse with a minor, even one who is 15 years of age, is a serious crime. While Mossman's victim may have believed she was mature enough to be a willing participant in the sexual acts and may have been less vulnerable than a very young child, Kansas law treats 15-year-old children as minors and recognizes them as deserving of the State's protection and legally incapable of consenting to sexual inter-course. See K.S.A. 21-3502(a); K.S.A. 21-3520(a); K.S.A. 21-3522(a); see also *State v. Limon*, 280 Kan. 275, 297, 122 P.3d 22 (2005) ("Certainly, the State has a significant interest in prohibiting sex between adults and minors, not only because of the potentially coercive effect of an adult's influence but also because of concern regarding the minor's ability to arrive at an informed consent."). An adult, such as Mossman, who comes in contact with a minor, even a seemingly mature minor, is expected to protect the child from the child's poor judgment, not take advantage of that poor judgment. Mossman, however, despite being aware of the victim's age and despite acknowledging that he knew he should not be having sex with her, took advantage of being a guest in his friend's home and knowingly engaged in illegal sexual activities for "some-

time." Accordingly, we reject Mossman's attempt to minimize the seriousness of the crime.

In his other argument, Mossman points out the assessment factors that Dr. Flesher noted weighed in Mossman's favor: his lack of a prior criminal history; his low risk of recidivism score, less than 3 percent risk of recidivism in 10 years; the fact that he had accepted responsibility for his actions; and his display of an "appropriate level of remorse" for this crime. Despite these mitigating factors, Dr. Flesher recommended Mossman participate in a sex offender treatment program and noted concerns about Mossman's inability to control his behavior because of his lack of impulse control, his rebellious character, and his history of drug use, all of which put him at some risk of reoffending.

Further, Mossman's arguments are unpersuasive because they focus solely on proportionality from the perspective of punishment or retribution while ignoring other legitimate penological goals such as deterrence, incapacitation, and rehabilitation. See *Graham*, 130 S. Ct. at 2028 (discussing recognized goals of sentencing). Post-release supervision is largely designed to act as a deterrent to future crime, a goal that is particularly legitimate given sex offenders' higher rate of recidivism. See *Doe*, 538 U.S. at 93. While Mossman scored low on an assessment test designed to predict the risk of recidivism, this score was countered to some extent by Dr. Flesher's concerns regarding Mossman's lack of impulse control and rebellious character. In addition, "[s]upervised release can further the end of rehabilitating sex offenders. . . . Relatedly, supervised release helps incapacitate sex offenders by keeping them under the watchful eye of probation officers who may be able to detect problems before they result in irreparable harm to innocent children." *United States v. Williams*, 636 F.3d 1229, 1234 (9th Cir.), *cert. denied* 132 S. Ct. 188 (2011); see also *Doe*, 538 U.S. at 99 (registration as a sexual offender does not constitute punishment, as the purpose of providing notice to the public about one who has committed a crime requiring registration is "to inform the public for its own safety, not to humiliate the offender"); *Dash*, 104 P.3d at 289, 293 (10 years-to-life period of parole for sex offense was not cruel and unusual punishment where legislature "has

determined that sex offenders present a continuing danger to the public and that a program providing for lifetime treatment and supervision of sex offenders is necessary for the safety, health, and welfare of the state").

Mossman attempts to minimize these goals by arguing that K.S.A. 22-3717(d)(1)(G) sweeps large numbers into the postrelease supervision system and thereby dilutes the ability to effectively rehabilitate or supervise offenders. As this argument suggests, postrelease supervision is not a guarantee against recidivism; nevertheless, it is undoubtedly more effective than failing to take any precaution or attempting long-term rehabilitation.

In summary, substantial competent evidence supports the district court's findings relating to the first *Freeman* factor and we will not reweigh that evidence. In turn, the district court's factual findings support its legal conclusion that the first *Freeman* factor does not weigh in Mossman's favor because Mossman's offense was a serious crime; historically a sex offense against a minor has been treated as a forcible or violent felony without regard to whether there is physical force; Mossman knowingly ignored his victim's status as a minor; Mossman acted in a manner consistent with his character, which was described as lacking in impulse control and reflecting a rebellious nature; and the penological purposes for lifetime postrelease supervision include retribution, deterrence, incapacitation, and rehabilitation.

Nevertheless, because no one factor is controlling, we must further consider the other two *Freeman* factors.

• *Second* Freeman *Factor*

Mossman focused most of his arguments on the second *Freeman* factor—comparison of his punishment with punishments imposed in this jurisdiction for more serious offenses. Mossman argued before the district court, as he does on appeal, that his lifetime postrelease supervision sentence is disproportionate to other sentences in Kansas. He provides the example of second-degree murder, which carries a longer prison sentence but carries a shorter postrelease supervision term of only 36 months. See K.S.A. 21-3402 (intentional second-degree murder is a severity level 1 person fel-

ony); K.S.A. 21-4704(a) (for a severity level 1 person felony, presumptive prison sentence with criminal history score of "I" is 165-155-147 months' incarceration; the maximum sentence in the grid block translates to 13.75 years); K.S.A. 22-3717(d)(1)(A) (36 months' postrelease supervision).

In response, the State acknowledges that a conviction for intentional second-degree murder does not require lifetime postrelease supervision but argues that "murderers do not necessarily have the same high rate of recidivism as sex offenders." The State further questions whether the punishment for intentional second-degree murder can be characterized as less severe than Mossman's punishment given the fact that intentional second-degree murder carries a longer prison sentence.

The district court agreed with the State's argument that proportionality of the sentence could not be based solely on a comparison of the postrelease supervision periods. The court noted that Mossman would serve only 59 months in prison, which is a more restrictive environment than postrelease supervision. In other words, while Mossman's overall sentence may be longer than that of someone convicted of second-degree murder, Mossman has the opportunity to serve most of that time in a less restrictive environment. Hence, a comparison of proportionality cannot be based solely on the length of postrelease supervision. See *Williams*, 636 F.3d at 1232 ("[A]lthough supervised release limits a criminal's liberty and privacy, it is a punishment far less severe than prison."). The district court's reasoning is further supported by the Oregon Court of Appeals' decision in *State v. Shaw*, 233 Or. App. 427, 225 P.3d 855, *rev. denied* 348 Or. 415 (2010).

The *Shaw* court rejected the defendant's contention that his mandatory sentence of 25 years' imprisonment and lifetime postrelease (called "post-prison") supervision was disproportionate to his crime of committing first-degree rape involving a victim under the age of 12. The defendant had based his argument on both the Oregon Constitution and the Eighth Amendment to the United States Constitution, and he focused on the fact his sentence was " 'greater even than the presumptive sentence that he would have received had he committed a murder.' " *Shaw*, 233 Or. App. at

430. The defendant also made note of his circumstances—he had no prior criminal record and was amenable to treatment.

The *Shaw* court found that, despite the defendant's lack of criminal history or likelihood of reoffending, the sentence did not present one of the " 'rare circumstances' in which a disproportionate punishment requires reversal. [Citations omitted.]" *Shaw*, 233 Or. App. at 430. Although most of the court's discussion focused on the length of incarceration, the court also stated: "In our view, the term of post-prison supervision is a constitutionally permissible, proportionate response by the legislature to the seriousness of the offense and the vulnerability of the victim involved in this case." *Shaw*, 233 Or. App. at 438. Further, "the lack of prior convictions alone has never been sufficient to render an otherwise constitutional penalty disproportionate" under the Oregon Constitution. *Shaw*, 233 Or. App. at 439.

To counter this view and the district court's conclusions, Mossman focuses on the potential conditions of his lifetime postrelease supervision sentence. He argues that "[u]nder postrelease supervision, he will be subject to many restrictions on his liberties" and endure the risk of lifetime incarceration if he commits another felony. See K.S.A. 75-5217(c). He specifically observes that he will be required to register as a sex offender under K.S.A. 22-4906, and the failure to register is classified as a felony. See K.S.A. 22-4903(a) ("Any person who is required to register as provided in the Kansas offender registration act who violates any of the provisions of such act, including all duties set out in K.S.A. 22-4904 through K.S.A. 22-4907, and amendments thereto, is guilty of a severity level 5, person felony."). Mossman argues it would be cruel or unusual punishment to require him to return to prison for the rest of his life if he fails to meet the sex offender registration requirement.

In support of this contention, Mossman cites *Bradshaw v. State*, 284 Ga. 675, 671 S.E.2d 485 (2008). There, the defendant was released after serving a sentence for statutory rape and subsequently committed two violations of the Georgia sex offender registration laws. Under Georgia law, a second registration violation mandated the imposition of life imprisonment. The defendant argued to the district court that mandatory life imprisonment con-

stituted cruel and unusual punishment under the Georgia Constitution and the Eighth Amendment to the United States Constitution.

The Georgia Supreme Court noted that the defendant's failure to update information on the sexual offender registry, by itself, involved " 'neither violence nor threat of violence to any person' " and was a " 'passive felony' that neither caused nor threatened to cause harm to society." *Bradshaw*, 284 Ga. at 679 (quoting *Solem v. Helm*, 463 U.S. 277, 296, 103 S. Ct. 3001, 77 L. Ed. 2d 637 [1983]). The *Bradshaw* court found the facts of the case accentuated the passivity of the defendant's failure to register his current address, observing, in part, that the defendant voluntarily appeared at the jail within 24 hours of an investigator informing the defendant's sister that he needed to contact the defendant. *Bradshaw*, 284 Ga. at 679.

The *Bradshaw* court further noted that "a sentence of life imprisonment is the third most severe penalty permitted by law, exceeded in severity only by capital punishment and life imprisonment without the possibility of parole." *Bradshaw*, 284 Ga. at 679. "Life imprisonment," stated the *Bradshaw* court, "is the most severe sentence that can be imposed for a crime that does not involve murder or recidivist punishment for a serious violent felony. [Citations omitted.]" *Bradshaw*, 284 Ga. at 679. In Georgia, a "serious violent felony" was statutorily defined as "malice and felony murder, armed robbery, kidnapping, rape, aggravated child molestation . . . , aggravated sodomy and aggravated sexual battery. [Citation omitted.]" *Bradshaw*, 284 Ga. at 679 n.7. After comparing the defendant's sentence of life imprisonment with the sentences imposed for these other crimes, and for sex offender registration violations in other jurisdictions, the *Bradshaw* court concluded that "the imposition of a sentence of life imprisonment is so harsh in comparison to the crime for which it was imposed that it is unconstitutional. [Citations omitted.]" *Bradshaw*, 284 Ga. at 683.

Mossman urges this court to adopt the rationale in *Bradshaw* and reach the conclusion that his lifetime postrelease supervision is unconstitutional. But *Bradshaw* did not address postrelease supervision and consequently does not suggest that lifetime post-

release supervision itself is overly harsh or disproportionate. Rather, as aptly observed by the State, the crux of Mossman's complaint is that the Kansas Legislature has chosen to classify a sex offender registration violation as a felony, which creates the potential for Mossman to be reimprisoned for life for violating the conditions of his postrelease supervision. K.S.A. 75-5217(c) ("If the [postrelease supervision] violation results from a conviction for a new felony, upon revocation, the inmate shall serve the entire remaining balance of the period of postrelease supervision even if the new conviction did not result in the imposition of a new term of imprisonment."). The classification of sex offender registration crimes and the proportionality of sentences for those crimes are not at issue in this case. We are considering the sentence for a sexually violent crime, as opposed to the passive offense at issue in *Bradshaw*. Hence, the rationale of *Bradshaw* is distinguishable.

The distinction is perhaps best illustrated by the fact that the Georgia Supreme Court in *Wiggins v. State*, 288 Ga. 169, 172, 702 S.E.2d 865 (2010), and *Rainer v. State of Georgia*, 286 Ga. 675, 675-76, 690 S.E.2d 827 (2010), without citing to its earlier decision in *Bradshaw*, rejected arguments that a sentence was cruel and unusual punishment because it included a requirement of lifetime registration as a sex offender. The requirement as a part of the sentence was deemed to be regulatory, not punitive, and a separate issue from *possible* future punishment for failing to register. *Rainer*, 286 Ga. at 676 (quoting *Frazier v. State*, 284 Ga. 638, 639, 668 S.E.2d 646 [2008], for proposition that " 'the fact that a violation of the registration requirements leads to a harsh penalty is not pertinent to whether the registration requirements are additional punishment for the previously-committed [crime]' "). Iowa courts have reached the same conclusion. See, *e.g.*, *Wade*, 757 N.W.2d at 623-24 (imposing a requirement of parole as part of a misdemeanor sentence for indecent exposure was not cruel and unusual punishment even though a violation of parole could lead to prison because any additional imprisonment would be imposed only if defendant violated the terms of parole); *State v. Harkins*, 786 N.W.2d 498, 507 (Iowa App. 2009) (mandatory special lifetime sentence imposed for third-degree sexual abuse, which defendant

would begin serving as if on parole following completion of 10-year prison sentence, was not grossly disproportionate to offense, and thus, was not cruel and unusual, where additional term of imprisonment would occur only if defendant violated terms of supervision).

Even so, Mossman will be subject to a lifetime restriction on his freedom. And, Mossman makes a valid point that his postrelease freedom will be constrained for a longer period than if he had committed second-degree murder, even if that restriction would end up being somewhat minimal (as opposed to some of the more significant restrictions that Mossman argues are likely). Nevertheless, Mossman's sentence to lifetime postrelease supervision is not grossly disproportionate in relation to the sentence applicable to second-degree murder in Kansas when we consider the penological purposes, the seriousness of the crime, and the other concerns discussed in relation to the first *Freeman* factor. In other words, the difference in proportionality between Mossman's sentence and one for second-degree murder is not so significant that the second *Freeman* factor outweighs the first *Freeman* factor.

But, we still must evaluate this conclusion in light of the third *Freeman* factor.

• *Third* Freeman *Factor*

Under the third *Freeman* factor—comparison of the penalty with punishments in other jurisdictions for the same offense—the district court noted the laws of several other states provide for lifetime postrelease supervision for sex offenses, although there are variations in the offenses covered and in whether the lifetime period of supervision is mandatory.

As the district court commented, a comparison of statutes between states is difficult because of the variety of ways states categorize a crime committed by an adult having sexual intercourse with a 15-year-old child. Nevertheless, Mossman concedes, and our research confirms, that at least three states—Colorado, Nebraska, and Oklahoma—mandate lifetime postrelease supervision for classes of offenses similar to Mossman's Kansas offense. See Colo. Rev. Stat. § 18-1.3-1001 (2011) ("a program under which sex offenders

may receive treatment and supervision for the rest of their lives, if necessary, is necessary for the safety, health, and welfare of the state"); Neb. Rev. Stat. §§ 83-174.03, 28-319.01 (2008) (lifetime supervision upon completion of incarceration for "registrable" sex offenses, which includes sexual assault of a child in the first degree); Okla. Stat. Ann. tit. 22, § 991a (A)(13) (2011) (supervision for period correlating with obligation to register as a sex offender); Okla. Stat. Ann. tit 57, § 584 (N)(2) (2011) (registration for certain crimes required for lifetime).

At least one other state—Arizona—permits but does not mandate lifetime postrelease supervision for a similar offense. Ariz. Rev. Stat. Ann. § 13-902(E) (2006) (permitting lifetime probation for sexual offenses). And at least two states have lifetime parole or other postrelease supervision for rape of certain minors but restrict that punishment to crimes involving children younger than the victim in this case. *E.g.*, Or. Rev. Stat. §§ 144.103(2), 137.765(2), 163.375(1)(b) (2011) (mandatory lifetime "post-prison" supervision for enumerated sex offenses if defendant was over 18 at time of the offense; also mandatory if defendant was over 18 and a sexually violent dangerous offender; mandatory for rape in first degree which includes offense committed against a child under age of 12); Utah Code Ann. §§ 76-3-202(3)(a), (b); 75-5-402.1(1); 76-5-404.1 (2008) (offenses against child under 14). In addition, Congress has granted federal courts the discretion to impose lifetime postrelease supervision for child pornography and child trafficking offenses. 18 U.S.C. § 3583(k) (2006); U.S. Sentencing Guidelines Manual § 5D1.2(b) (2011).

Still other states, as noted by the district court in this case, provide for lifetime postrelease supervision for various sex offenses but allow the possibility of release or discharge. See, *e.g.*, Iowa Code Ann. §§ 903B.1 (mandatory lifetime supervision for offenders committing certain offenses, such as sexual exploitation of a minor), 906.15 (2003) (certain sex offenders on lifetime supervision "shall not be discharged from parole until the person's term of parole equals the period of imprisonment specified in the person's sentence"); Mo. Stat. Ann. § 217.735 (2004) (mandatory lifetime supervision for certain sex offenses and classes of offenders; su-

pervision may be terminated after offender turns 65 years old); Nev. Rev. Stat. § 176.0931 (2011) (special sentence of lifetime supervision for sex offenders but may petition for release); N.J. Stat. Ann. § 2C:43-6.4(a), (c) (2009) (mandatory parole supervision for life for enumerated sex offenses; possibility of release if shows "by clear and convincing evidence that the person has not committed a crime for 15 years since the last conviction or release from incarceration, whichever is later, and that the person is not likely to pose a threat to the safety of others if released from parole supervision"); Tenn. Code Ann. §§ 39-13-524 (mandatory supervision for life for enumerated sex offenses), 39-13-525(a) (2010) (offender on life supervision may petition the court for release after 15 years); Wis. Stat. Ann. § 939.615(2), (6) (2005) (providing that a sex offender may be sentenced to lifetime supervision; offender may petition the court for termination after 15 years).

Several other states provide for lifetime postrelease supervision of repeat offenders, those convicted of aggravated sex offenses, or where there is some other aggravating factor. Mossman lists at least four states in this category. E.g., Ind. Code Ann. § 35-50-6-1(e) (2009) (sexually violent predator); Md. Criminal Procedure Code Ann. § 11-723(a) (2008) (sexually violent predator; enumerated sex crimes); Minn. Stat. Ann. § 609.3455(7) (2009) (certain "engrained offenders" and repeat sex offenders); Mont. Code Ann. §§ 46-23-509(2)(c), (3)(c) (offender found level 3 offender after evaluation), 45-5-503(4)(b) (sexual intercourse without consent, victim 12 or younger), 45-5-507(5) (incest, victim 12 or younger), 45-5-601(3) (prostitution, victim 12 or younger), 45-5-602(3) (promoting prostitution, victim 12 or younger), 45-5-625(4) (2011) (sexual abuse of children, victim 12 or younger).

Several courts have held these or similar provisions are not cruel and unusual punishment. See, e.g., Williams, 636 F.3d at 1233-35 (life term of supervised release for those convicted of federal child pornography crimes is not cruel and unusual punishment); United States v. Moriarty, 429 F.3d 1012, 1025 (11th Cir. 2005) (same); People v. Dash, 104 P.3d 289, 293 (Colo. App. 2004) (Colorado's 10 years-to-life period of parole for sex offense was not cruel and unusual punishment); Harkins, 786 N.W.2d at 507 (Iowa's man-

datory special lifetime sentence imposed for third-degree sexual abuse, which defendant would begin serving as if on parole following completion of 10-year prison sentence, was not grossly disproportionate to offense); *Walls v. State*, No. 58,895, 2011 WL 5865073 (Nev. 2011) (unpublished opinion) (summarily rejecting defendant's argument that lifetime supervision for attempted lewdness with a minor under the age of 14 was cruel and unusual punishment); *Shaw*, 233 Or. App. at 437-39 (lengthy prison sentence followed by lifetime "post-prison" supervision not cruel and unusual punishment).

Although our categorization varies somewhat from Mossman's and we found states not included in his listing, it seems fair to say that less than half of states provide for lifetime postrelease supervision of some or all sex offenders and, because several states have a mechanism for termination of the postrelease supervision under certain conditions, only a handful of states impose punishment as absolute as Kansas' requirement. Nevertheless, Kansas is not alone in imposing mandatory lifetime postrelease supervision for crimes such as Mossman's, and we are not aware of any court that has found lifetime postrelease supervision of a violent sex offender to be cruel and unusual punishment. Perhaps because of that, Mossman's primary argument regarding the third *Freeman* factor is that the first two *Freeman* factors alone require this court's conclusion that his lifetime postrelease supervision sentence is unconstitutional.

As we have already discussed, we do not find that Mossman's lifetime postrelease supervision sentence is cruel or unusual punishment under the first two *Freeman* factors. Moreover, even when adding the third *Freeman* factor into the equation and considering that Kansas' provision is more severe than most other jurisdictions, we do not find the sentence to be cruel or unusual. Mossman's offense is serious and is a sex crime against a minor that historically has been treated as a forcible or violent felony regardless of whether there is physical force. Mossman exhibited characteristics of poor impulse control, rebelliousness, and a history of drug abuse. And legitimate penological goals—retribution, deterrence, incapacitation, and rehabilitation—are furthered by lifetime post-

release supervision. These factors outweigh the lack of strict proportionality with other sentences in Kansas and other jurisdictions, especially given that the sentence is not grossly disproportionate.

Consequently, Mossman's lifetime postrelease supervision sentence does not constitute cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights.

## EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION

Mossman also argues his lifetime postrelease supervision sentence violates the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution. As previously noted, after the original briefs were filed in this case, the United States Supreme Court decided *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 2021, 176 L. Ed 2d 825 (2010), and held: "The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' [Citation omitted.]" We subsequently asked the parties to supplement their briefs in this appeal in light of the *Graham* decision.

In *Graham*, the United States Supreme Court considered whether a life sentence without possibility of parole imposed on a juvenile offender was cruel and unusual punishment under the Eighth Amendment. Graham committed armed burglary and another crime when he was 16 but was placed on probation without an adjudication of guilt. When he violated his probation, in part, by committing a new crime, he was found guilty of the armed burglary, his probation was revoked, and he was sentenced to life imprisonment, which under Florida law left him with no hope of leaving prison unless he received executive clemency. The Court concluded this sentence was disproportionate. *Graham*, 130 S. Ct. at 2029-30.

In reaching this holding, the Court recognized the availability of a proportionality challenge pursuant to the Eighth Amendment in cases other than those where the punishment is death. The Court discussed two general classifications for an attack on a term-of-years sentence. "The first [category] involves challenges to the

length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty." *Graham*, 130 S. Ct. at 2021; see *State v. Gomez*, 290 Kan. 858, 863-66, 235 P.3d 1203 (2010) (discussing *Graham*). The Court made it clear that the first category is available for any term-of-years sentence. As we will discuss, the Court did not clarify whether the second category is available in cases other than those where the death penalty was imposed or a juvenile was sentenced to life imprisonment for a nonhomicide crime.

- *Case-Specific Proportionality Challenge*

In this case, the district judge, in his pre-*Graham* analysis, mentioned the Eighth Amendment and prior decisions of the United States Supreme Court when making his findings and, although in the context of state constitutional issues, made factual findings that coincide with *Graham*'s case-specific proportionality factors. We are, therefore, able to consider the issue.

The applicable factors relevant to the first federal classification were explained in a general manner by the *Graham* majority, which stated:

"The controlling opinion in [*Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991)] explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime. A court must begin by comparing the gravity of the offense and the severity of the sentence. 501 U.S., at 1005 (opinion of Kennedy, J.). '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation omitted.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual. [Citation omitted.]" *Graham*, 130 S. Ct. at 2022.

Chief Justice Roberts, in his concurring opinion, expanded on the factors discussed in past cases, noting:

"Our cases indicate that courts conducting 'narrow proportionality' review should begin with a threshold inquiry that compares 'the gravity of the offense

and the harshness of the penalty.' [*Solem v. Helm*, 463 U.S. 277, 290-91, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983)]. This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by his conduct, and any prior criminal history. *Id.*, at 292-294, 296-297, and n.22, (considering motive, past criminal conduct, alcoholism, and propensity for violence of the particular defendant); see also [*Ewing v. California*, 538 U.S. 11, 28-30, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003)] (plurality opinion) (examining defendant's criminal history); *Harmelin*, 501 U.S., at 1001-1004, (opinion of Kennedy, J.) (noting specific details of the particular crime of conviction)." *Graham*, 130 S. Ct. at 2037-38 (Roberts, C.J., concurring).

Both the *Graham* majority opinion and Chief Justice Roberts' concurring opinion emphasize that it is only the rare case where the Eighth Amendment threshold comparison of the gravity of the offense and the harshness of the penalty will lead to an inference of gross disproportionality. This point is illustrated by a series of cases in which the Court held a life sentence for a nonviolent theft or drug crime was not cruel and unusual punishment. *E.g., Lockyer v. Andrade*, 538 U.S. 63, 70, 77, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) (sentence of two consecutive prison terms of 25 years-to-life for third-strike conviction for stealing approximately $150 in videotapes); *Ewing*, 538 U.S. at 28-31 (25 years-to-life sentence under three-strike provision for stealing approximately $1,200 of merchandise); *Harmelin*, 501 U.S. at 961, 996 (life sentence without possibility of parole for first felony offense, which was possession of more than 650 grams of cocaine); *Rummel v. Estelle*, 445 U.S. 263, 266, 285, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) (life sentence with possibility of parole, imposed under a Texas recidivist statute, for a defendant convicted of obtaining $120.75 by false pretenses [his third felony conviction], an offense normally punishable by imprisonment for 2 to 10 years); but see *Solem*, 463 U.S. at 296-97, 303 (life sentence without possibility of parole imposed on adult offender was "significantly disproportionate" to the defendant's crime, which was predicated on a current offense of "uttering a 'no account' check" for $100 and the defendant's lengthy criminal history that included seven nonviolent felonies).

These cases indicate the Supreme Court allows considerable latitude to a legislature's policy decision regarding the severity of a sentence. A statement made by Justice Kennedy in his concurring

opinion in *Harmelin* provides insight into the Court's view of the policy judgment inherent in a proportionality decision. He noted: "[A] rational basis exists for Michigan to conclude the petitioner's crime [of possessing a large quantity of cocaine] is as serious and violent as the crime of felony murder without specific intent to kill, a crime for which 'no sentence of imprisonment would be disproportionate.' [Citation omitted.]" *Harmelin*, 501 U.S. at 1004 (Kennedy, J., concurring). For purposes of our analysis, it is reasonable to substitute aggravated indecent liberties with a child as the crime referred to in that statement because the Supreme Court has observed that sex offenders represent a particularly serious threat in this country given that they are more likely than any other criminals to commit violent crimes following their release from prison. *McKune v. Lile*, 536 U.S. 24, 32-33, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002).

In addition, we note that Mossman suggests, although he does not elaborate on the suggestion, that we should interpret the Kansas Constitution broader than the Eighth Amendment. In contrast, he does not suggest any basis for finding case-specific disproportionality under the Eighth Amendment to the United States Constitution if we have rejected such an argument under § 9 of the Kansas Constitution Bill of Rights. As we discussed in the context of the first *Freeman* factor, Mossman admitted he knew he should not have sex with a 15-year-old girl, yet he chose to do so. And, although he scored low for a potential of reoffending, Dr. Fisher and the district court were concerned about his lack of impulse control, his rebellious character, and his long history of drug abuse. Again, we will not reweigh the district court's findings, which were supported by substantial competent evidence. Because we hold Mossman's sentence is not grossly disproportionate—the threshold Eighth Amendment inquiry—we do not reach the secondary Eighth Amendment inquiry of comparing Mossman's sentence to other Kansas sentences or the sentences in other states for similar offenses. In this way, an Eighth Amendment analysis differs from a *Freeman* analysis (under the Kansas Constitution) that requires consideration of all factors. See *State v. Freeman*, 223 Kan. 362,

367, 574 P.2d 950 (1978); *State v. Ortega-Cadelan*, 287 Kan. 157, 160-61, 194 P.3d 1195 (2008).

For these reasons, Mossman's Eighth Amendment case-specific proportionality challenge fails.

- *Categorical Proportionality Challenge*

In response to this court's order for supplemental briefing and in addition to a case-specific proportionality challenge under the Eighth Amendment to the United States Constitution, Mossman also takes a broader approach by asserting that the second federal classification—a categorical proportionality challenge—leads to the conclusion that lifetime postrelease supervision imposed for a certain class of offenders is cruel and unusual punishment under the Eighth Amendment. Mossman describes this class of offenders as those who have committed "first offenses involving sex with persons 14 or older, without any element of force, coercion, prostitution, or pornography."

There are several threshold considerations: (1) the appropriate standard of review; (2) whether we reach the constitutional question; and (3) the categorynature of the offense or class of offendersto which the determination of proportionality applies.

A. *Threshold Considerations*

(1) *Standard of Review*

As to our standard of review, in contrast to issues involving a claim of cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights or a case-specific proportionality claim of cruel and unusual punishment under the Eighth Amendment to the United States Constitution, a categorical proportionality analysis under the Eighth Amendment does not require a review of the district court's factual findings. Instead, only questions of law are implicated. This court has unlimited review over legal questions. See *State v. King*, 288 Kan. 333, 355, 204 P.3d 585 (2009); *State v. Martinez*, 288 Kan. 443, 449, 204 P.3d 601 (2009).

(2) *Do we address the constitutional question?*

As we have noted, in *Graham* the United States Supreme Court did not clarify whether a categorical proportionality challenge is

available to all criminal defendants. Nevertheless, after noting that such a challenge had been historically limited to death penalty cases, the *Graham* majority applied the categorical analysis to a juvenile offender who was sentenced to life imprisonment without possibility of parole for a nonhomicide crime. *Graham*, 130 S. Ct. at 2022, 2034.

Soon after the *Graham* decision, in *Gomez* we observed it was not clear whether the Supreme Court would apply *Graham's* categorical analysis in contexts other than death penalty cases and cases involving juvenile offenders sentenced to life imprisonment without possibility of parole for nonhomicide crimes. *Gomez*, 290 Kan. at 865-66. To date, neither the United States Supreme Court nor this court has addressed whether the analysis would be extended to other categorical proportionality challenges.

Other courts have reached the question, and many have indicated that *Graham* is not to be extended beyond cases involving juveniles convicted of nonhomicide offenses. *E.g.*, *Loggins v. Thomas*, 654 F.3d 1204, 1223 (11th Cir. 2011) ("The Court's opinion in [*Graham*] expressly states that the decision is limited to life without parole sentences imposed on juveniles for nonhomicide offenses."); *United States v. Scott*, 610 F.3d 1009, 1018 (8th Cir. 2010), *cert. denied* 131 S. Ct. 964 (2011) (noting "the Court's analysis in *Graham* was limited to defendants sentenced to life in prison without parole for crimes committed as juveniles"); *Miller v. State*, 63 So. 3d 676, 685-91 (Ala. Crim. App. 2010), *cert. granted* 132 S. Ct. 548 (2011) (refusing to extend the holding in *Graham* to juveniles who committed murder); *Jackson v. Norris*, 2011 Ark. 49, 378 S.W.3d 103, 106, 2011 WL 478600 (Ark.), *cert. granted* 132 S. Ct. 548 (2011) ("The Court's holdings in *Roper* [*v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)] and *Graham* are very narrowly tailored to death-penalty cases involving a juvenile and life-imprisonment-without-parole cases for nonhomicide offenses involving a juvenile."); *People v. Murray*, 136 Cal. Rptr. 3d 820, 825-26, 203 Cal. App. 4th 277 (2012) (declining to apply *Graham* to no-parole life sentences for juvenile offenders who commit murder); *Gonzalez v. State*, 50 So. 3d 633, 635 (Fla. Dist. App. 2010), *rev. denied* 60 So. 3d 387 (Fla.), *cert. denied* 132 S.

Ct. 387 (2011) (refusing to extend the holding in *Graham* to juveniles who committed murder).

Nevertheless, the Ninth Circuit Court of Appeals in *United States v. Williams*, 636 F.3d 1229, 1234 (9th Cir.), *cert. denied* 132 S. Ct. 188 (2011), applied *Graham* to a categorical proportionality challenge to lifetime supervised release. And, very recently, the Iowa Supreme Court applied *Graham* to a defendant's challenge that his life sentence for a second sexual offense was cruel and unusual. *State v. Oliver*, 812 N.W.2d 636, No. 10-1751, 2012 WL 1058249 (Iowa 2012). Other courts have also applied *Graham* outside of death penalty cases or cases dealing with a life sentence for a juvenile convicted of a crime other than homicide. *E.g., McCullum v. State*, 60 So. 3d 502, 503-04 (Fla. Dist. App.), *rev. denied* 67 So. 3d 1050 (2011) (defendant's sentences of life imprisonment without possibility of parole, imposed after defendant pleaded guilty to attempted second-degree murder and robbery with a firearm committed while defendant was a juvenile, violated the Eighth Amendment prohibition against cruel and unusual punishment); *Angel v. Commonwealth*, 281 Va. 248, 273-75, 704 S.E.2d 386, *cert. denied* 132 S. Ct. 344 (2011) (imposition of life sentences without parole on defendant, who was a juvenile at time of charged offenses, was not cruel and unusual punishment; conditional release statute, while containing an age qualifier, provided a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation).

Given the split of authority, including a split between federal circuits, until further clarification is received we choose to address the issue rather than foreclose an argument based on what may turn out to be an unintended, overly strict reading of the *Graham* decision.

### (3) *Applicable Category—Nature of the Offense or Class of Offenders*

Next, we consider the category to which our analysis should apply. In *Graham*, the Court indicated its earlier decisions had considered two categorical subsets in the context of its death penalty cases: one related to the nature of the offense, the other to the

characteristics of the offender. *Graham*, 130 S. Ct. at 2022. In framing the issue in *Graham*, the Court noted the "case implicates a particular type of sentence as it applies to an *entire* class of offenders who have committed a *range* of crimes." (Emphasis added.) *Graham*, 130 S. Ct. at 2022-23. In contrast to those broad categories, in this case Mossman suggests we refine the legislative definition of the "range of crimes"—which encompasses sexually violent crimes, including aggravated indecent liberties with a child—and the legislative class of offenders—which includes all those committing a sexually violent crime. Mossman would limit the range of crimes to those involving sex with a child who is 14 or 15 where the crime is committed without any element of force, coercion, prostitution, or pornography and the class of offenders to those sex offenders who have committed a first offense.

Regarding the nature or classification of the crime, Mossman cites no authority for and no example of such a specifically carved classification. Indeed, his categorization is so case-specific it seems to obliterate the distinction between the two categories of analysis: (1) a case-specific analysis that "would allow courts to account for factual differences between cases" and (2) a categorical analysis. *Graham*, 130 S. Ct. at 2031-33. While the Supreme Court has discussed categories somewhat more narrow than the elements of a crime, such as the rape of an adult where the age of the victim was not an element, it has never refined the category—nature of the offense—to the extent proposed by Mossman. See *Coker v. Georgia*, 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977). We conclude the nature of the offense that applies to our analysis is the category reflecting Mossman's offense—aggravated indecent liberties with a child.

As to the class of offenders, the Supreme Court has categorized defendants by broad characteristics such as those who committed their crimes before the age of 18 or whose intellectual functioning is in a low range. See *Roper*, 543 U.S. at 578; *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). Mossman's category of first-time sex offenders seems consistent with the manner in which the Supreme Court has categorized clas-

ses of offenders in these past cases, and therefore we will consider that category in our analysis.

## B. *Categorical Analysis*

The *Graham* Court outlined the steps of a categorical analysis, stating:

"The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue. [Citation omitted.] Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' [citation omitted], the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution. [Citation omitted.]" *Graham*, 130 S. Ct. at 2022.

Explaining the application of these factors, the Court stated:

"Community consensus, while 'entitled to great weight,' is not itself determinative of whether a punishment is cruel and unusual. [Citation omitted.] In accordance with the constitutional design, 'the task of interpreting the Eighth Amendment remains our responsibility.' [Citation omitted.] The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. [Citations omitted.] In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals. [Citations omitted.]" *Graham*, 130 S. Ct. at 2026.

Finally, the *Graham* Court noted its past cases recognized retribution, deterrence, incapacitation, and rehabilitation as "legitimate" goals of penal sanctions. *Graham*, 130 S. Ct. at 2028.

The Ninth Circuit Court of Appeals applied this analysis in *Williams*, 636 F.3d 1229, to a claim that lifetime supervised release for child pornography was cruel and unusual punishment. In rejecting the constitutional challenge, the court stated:

"Here, 'objective indicia' suggest that society is comfortable with lifetime sentences of supervised release for sex offenders, as such sentences are common. According to the United States Sentencing Commission, in the last five years, federal courts have sentenced 1875 defendants convicted of child pornography and child prostitution crimes to lifetime supervised release. See U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release 58-59 (July 2010), www. ussc. gov/ general/ 20100722_ Supervised_ Release. pdf. By way of comparison, in banning the sentence of life without parole for juvenile nonhomicide

offenders, the Supreme Court noted that there were then just 123 people in the county serving such sentences. See *Graham*, 130 S. Ct. at 2024. Further, the percentage of federal sex offenders receiving life terms of supervised release is increasing, climbing from 9.3 percent in 2005, to 20.5 percent in 2009. [Citation omitted.]" *Williams*, 636 F.3d at 1233-34.

In addition, as we have previously discussed, several other states have adopted lifetime postrelease supervision for many, if not all, sexually violent crimes. Hence, the numbers cited in *Williams* do not reflect the total number of sex offenders subject to lifetime postrelease supervision.

The *Williams* court next exercised its " 'independent judgment' " by considering " 'whether the challenged sentencing practice serves legitimate penological goals.' " *Williams*, 636 F.3d at 1234 (quoting *Graham*, 130 S. Ct. at 2026). As quoted earlier, the *Williams* court noted that the goals of rehabilitation and incapacitation "are central purposes of the criminal justice system, and they are particularly critical here given the propensity of sex offenders to strike again." *Williams*, 636 F.3d at 1234.

The Ninth Circuit's conclusion applies equally to those sentenced in Kansas to postrelease supervision for the crime of aggravated indecent liberties with a child. Further, although Williams was a repeat sex offender rather than a first-time sex offender like Mossman, some of the penological objectives for lifetime postrelease supervision—particularly deterrence, incapacitation, and rehabilitation—are the same whether the offender has committed one or many offenses. Accordingly, we conclude the analysis is persuasive as to both the classification of the crime and its application to the class of first-time sex offenders, especially when we factor in other states' acceptance of lifetime postrelease supervision when an offender has committed a similar crime.

As a result, we hold that Mossman's sentence to lifetime postrelease supervision under K.S.A. 22-3717(d)(1)(G) for his conviction of aggravated indecent liberties with a child is not categorically disproportionate and, therefore, is not cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

Affirmed.

* * *

JOHNSON, J., dissenting: Occasionally, I find it helpful to set aside the catch-phrases and multiple-part tests and try to distill an issue to its simplest form. In that vein, I discern that proportionality might just be another way of saying that the punishment should fit the crime. In my view, lifetime postrelease supervision does not fit the crime in this case.

Mossman was 25 years old when he committed this offense. With lifetime postrelease supervision, he will not experience another day of freedom the rest of his life. The government can control what he does and where he goes for the next 40, 50, perhaps even 60 or 70 years. That draconian punishment is the result of Mossman's immature inability to reject a 15-year-old female's encouragement to have sex with her, or, in the majority's words, Mossman's failure "to protect the child from the child's poor judgment."

To be crystal clear on the matter, I too find Mossman's conduct to be inexcusable and properly punishable by our criminal courts. Adults, even young adults with impulse control problems, are expected to exercise self-control and restraint with minors under the age of 16 years, no matter how mature and alluring the 14- or 15-year-old may appear.

Interestingly, the majority speaks of exercising adult will-power with "minors," which suggests that such restraint and protection from poor judgment must be exercised with any unmarried person under the age of 18 years. See K.S.A. 38-101 (defining the period of minority as 18 years for unmarried persons). While we who are parents and grandparents might well embrace such a rule, our legislature has not. Sexual intercourse with a minor who has reached the age of 16 years is not a crime. See, *e.g.*, K.S.A. 21-3504(a)(1) (aggravated indecent liberties with a child includes sexual intercourse with a child who is 14 or more years of age but less than 16 years of age).

In other words, if Mossman had sexual intercourse with the victim when she was 15 years, 364 days, 23 hours, and 59 minutes old, he committed a crime that would subject him to lifetime postrelease supervision. A minute later, he could not be punished at

all for the act, much less be given a life sentence. Granted, lines are drawn all the time. However, the legislature itself has acknowledged the need to make the punishments incremental in this context. If the victim here had been under 14 years old, the crime would have been the off-grid version of rape, subject to a hard 25 life sentence. K.S.A. 21-3502(a)(2) and (c). Instead, the crime here is the on-grid version of aggravated indecent liberties with a child. To me, it is disproportionate to make the punishment for both crimes last a lifetime.

Accordingly, although I would apply the same *Freeman* factors as the majority, I would reach different conclusions and a different result. However, given the singular nature of my opinion, it need not occupy any further space here. It is enough that I am able to have the opportunity to opine that the lifetime postrelease supervision portion of Mossman's sentence is unconstitutionally cruel or unusual under § 9 of the Kansas Constitution Bill of Rights.