NOT DESIGNATED FOR PUBLICATION

No. 112,226

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHANE HIMMAUGH,
*Appellant*.


MEMORANDUM OPINION

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed December 4, 2015.
Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Amy E. Norton*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, P.J., ATCHESON, J., and WALKER, S.J.


*Per Curiam*:  Shane Himmaugh was arrested and charged with one count of indecent liberties with a child and one count of aggravated indecent liberties with a child. Himmaugh's case went to trial, and a jury found him guilty on both counts. Himmaugh was sentenced to 59 months' imprisonment followed by lifetime postrelease supervision. Himmaugh appeals, alleging there were two errors with the jury instructions given at his trial, and seeking a determination his sentence was unconstitutional.

FACTUAL AND PROCEDURAL HISTORY

One afternoon in September 2013, 19-year-old Shane Himmaugh went to the home of his friend L.C.'s mother and two younger sisters to show them his new truck. After a short time, Himmaugh left. Later that afternoon Himmaugh contacted one of the sisters, 15-year-old M.C., via Facebook messenger.

At 6:30 the same evening, Himmaugh returned to M.C.'s home and sent her a message asking her to come outside to see him. She went out the back door with her dogs and met Himmaugh in the alley behind her house. After she hugged him, Himmaugh took M.C.'s arm and led her away from the house, behind a camper parked on an adjacent lot. M.C. testified that Himmaugh held on to her arm tightly enough that she tried but was unable to pull it away.

Once M.C. and Himmaugh were behind the camper, Himmaugh grabbed M.C.'s hand and held it open. He then exposed himself and placed his penis in her hand. After a minute M.C. pulled her hand back and told Himmaugh to stop. Himmaugh then put his hand down M.C.'s pants and inserted at least one finger into M.C.'s vagina. While Himmaugh was doing this, he began kissing M.C.'s neck. This continued for about 4 minutes. After Himmaugh removed his hand, he told M.C. that he wanted to come back later and have sex with her.

The episode ended when M.C.'s mother, C.C., came out of the house to look for her. C.C. noticed one of her dogs running over from the far side of the camper on the adjacent lot so she began walking in that direction. When C.C. reached the camper, she found M.C. standing there. C.C. asked what M.C. was doing and if there was someone else with her. M.C. told C.C. she was alone and was just in the lot retrieving the dog. M.C. then returned to the house. C.C. walked a bit farther and saw Himmaugh lying

2

behind a large dirt mound. C.C. asked Himmaugh what he was doing there with her daughter. Himmaugh told her nothing was going on.

In the days after the incident, C.C. continued questioning M.C. about what she had been doing behind the camper with Himmaugh. For several weeks M.C. maintained that all that had happened was that she kissed Himmaugh. Eventually, M.C. told C.C. what had actually happened. C.C. then called the police and reported the incident.

Officer Gary Hanus responded to C.C.'s call. Hanus interviewed C.C. and M.C. The next day Hanus interviewed Himmaugh.

During the interview, Himmaugh admitted that he knew M.C. was either 14 or 15 years old. Himmaugh initially told Hanus that, on the evening in question, he happened to be driving by M.C.'s house and saw her out walking the dogs. He said he stopped and talked with M.C. for a little while until C.C. came out of the house and started yelling at him for talking to M.C. At some point, Himmaugh's story morphed and he acknowledged that he had made physical contact with M.C. but said he was only tickling and teasing her. Later, Himmaugh admitted that he had touched M.C. on her upper right thigh.

Himmaugh was charged with one count of aggravated indecent liberties with a child and one count of indecent liberties with a child. At trial, Himmaugh objected to a jury instruction that defined lewd fondling or touching and contained a reference to "the victim." Himmaugh's objection was overruled. The jury found Himmaugh guilty of both counts.

At the sentencing hearing, Himmaugh objected to the imposition of lifetime postrelease supervision as cruel and unusual and asked that the postrelease supervision period be reduced to 36 months. The district court conducted an analysis of the *Freeman*

factors as they applied to Himmaugh, then denied the motion. Himmaugh was sentenced to 59 months' imprisonment followed by lifetime postrelease supervision.

Himmaugh filed a timely appeal.

ANALYSIS

*The district court did not err when it referenced "the victim" in its instruction.*

Himmaugh argues that the district court erred in issuing Jury Instruction No. 5 which reads:

> "Lewd fondling or touching means fondling or touching in a manner which tends to undermine the morals of the victim, which is so clearly offensive as to outrage the moral senses of a reasonable person, and which is done with the specific intent to arouse or satisfy the sexual desires of either the victim or the offender or both. Lewd fondling or touching does not require contact with the sex organ of one or the other."

The instruction given varies slightly from the standard PIK instruction, primarily by the substitution of the word "victim" for the word "child." See PIK Crim. 4th 55.020(h). Himmaugh complains that reference to "the victim" essentially directed a verdict in favor of the State. He contends that the instruction implied there had been a victim in this case, which invades the province of the jury to decide whether a crime has been committed and thus whether there is a victim.

PIK instructions are favored by the courts. Deference is given to PIK instructions because they "were developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions." *State v. Beck*, 32 Kan. App. 2d 784, 786, 88 P.3d 1233, *rev. denied* 278 Kan. 847 (2004). Although courts are not required to use the

4

pattern instructions, the instructions are "strongly recommended for use by Kansas trial courts." 32 Kan. App. 2d at 786.

When an appellant challenges a jury instruction given by the district court, this court conducts a multi-step review. *State v. Smyser*, 297 Kan. 199, 203-04, 299 P.3d 309 (2013).

The first step of this analysis is whether the issue has been properly preserved for appeal. Himmaugh objected at trial to the use of Jury Instruction No. 5, arguing then, as he does now, that use of the word "victim" in the instruction "presupposes the commission of a criminal act." By objecting to the instruction at trial, Himmaugh properly preserved this issue for appeal. See *Smyser*, 297 Kan. at 204.

The second step of the analysis requires this court to determine whether the instruction given was legally accurate. See 297 Kan. at 204. In support of his argument that use of the word "victim" in the instruction was legally impermissible, Himmaugh first cites two cases from other jurisdictions in which error was found when the victim in the case was referred to as "the victim" during the trial. Because these cases are from other jurisdictions and address an issue different from the one presented here, they are of little value to the resolution of this appeal.

Himmaugh then goes on to argue that his position is supported by *State v. Brice*, 276 Kan. 758, 80 P.3d 1113 (2003). In *Brice*, the Kansas Supreme Court determined that Brice's rights were violated when the district court instructed the jury that the definition of great bodily harm was "a through and through bullet wound," the exact injury Brice was accused of inflicting on the victim. 276 Kan. at 768-69 ("[I]n instructing the jury that great bodily harm means what the State's evidence showed, the trial judge effectively instructed the jury that the element had been proved."). Himmaugh analogizes his situation to Brice's and argues that the use of the word "victim" "took away

5

[Himmaugh's] right to have a jury decide all the elements of the crimes charged by the State."

In response, the State argues that the current definition of lewd fondling or touching contained in PIK Crim. 4th 55.020(h) was approved by our Supreme Court in *State v. Wells*, 223 Kan. 94, 573 P.2d 580 (1977). However, in *Wells*, the Supreme Court did not use the word "victim" in defining lewd fondling or touching, it used the word "child" instead. 223 Kan. at 97. To add support for the modification of the instruction to read "victim" rather than "child," the State cites *State v. Stout*, 34 Kan. App. 2d 83, 86, 114 P.3d 989, *rev. denied* 280 Kan. 991 (2005). There, this court seemed to extend the *Wells* definition to provide the option of using victim rather than child in defining lewd fondling or touching. See 34 Kan. App. 2d at 86. However, whether use of the word "victim" was appropriate was not at issue in *Stout*.

Finally, the State argues that "defining a term is completely different than telling [the] jury that certain evidence meets that definition." We agree.

Jury Instruction No. 5 attempts to define lewd fondling and must necessarily distinguish between the underage person involved in the fondling incident and the person involved who was over the age of 18. If someone over the age of 18 engaged in the activity described in the instruction with someone under the age of 16, then the child was necessarily a victim because such activity has been criminalized. This instruction does not attempt to minimize or shift the State's burden of proof. The instruction does not implicitly require that the jury conclude that Himmaugh, who was over the age of 18 at the time, engaged in lewd fondling or touching with M.C. who was under the age of 16. The instruction merely defines the context in which a touch would be considered lewd fondling and then permits the jury to infer that M.C. was a victim if she had been touched in the way described in the instruction.

6

This situation is different from that in *Brice*. There, the jury was asked to determine whether Brice was guilty of severity level 4 aggravated battery, which required proof that he caused great bodily harm. Although great bodily harm is not defined in the statute, the district court instructed the jury that great bodily harm meant a through and through bullet wound. See *Brice*, 276 Kan. at 762-63. Our Supreme Court found that this instruction violated Brice's Fifth and Sixth Amendment rights under the United States Constitution and remanded the case for a new trial. 276 Kan. at 775-76. The court reasoned: "[A]lthough not actually instructing the jury that Brice caused great bodily harm to Kelly, the trial judge left no room for the jury to believe otherwise. . . . The trial judge in effect directed a verdict on an essential element of the aggravated battery charge." 276 Kan. at 771. Here, as discussed above, use of the word "victim" does not have the same effect of directing a jury verdict in favor of the State.

Because the instruction given did not impermissibly invade the province of the jury and direct a verdict for the State, use of the instruction did not violate Himmaugh's rights and was legally sound.

The third step of the required analysis—determining whether there was sufficient evidence to support giving the challenged instruction—is inapplicable here since this was merely a definitional instruction.

The fourth step of the analysis, harmlessness, only comes into play if, during the course of earlier steps, the appellate court finds that the challenged instruction was given in error. *Smyser*, 297 Kan. at 204. Because we have found that the instruction was not given in error, we need not reach the fourth step.

*The district court did not err when it instructed the jury that its verdict must be founded upon the law given in the instructions.*

Himmaugh next argues that the district court erred when it instructed the jury that its verdict "'must be founded entirely upon the evidence admitted and the law as given in these instructions'" because the instruction negated the jury's right to nullify the verdict. Himmaugh did not object to this instruction at trial.

When a party fails to object to an instruction given at trial, he or she is prohibited from later arguing that the trial court erred in giving the instruction unless the instruction was "clearly erroneous." K.S.A. 2014 Supp. 22-3414(3). The appellate court uses a two-step process to decide whether the challenged instruction was clearly erroneous. First, the court must determine whether there was any error at all by considering whether the subject instruction was legally and factually appropriate. Second, if the court finds error, it must assess whether it is firmly convinced that the jury would have reached a different verdict without the error. In doing this analysis, the court has unlimited review of the entire record. The party claiming error in the instructions bears the burden of proving the degree of prejudice necessary for reversal. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). This court has an unlimited power of review to determine the legality of this instruction. *State v. Smyser*, 297 Kan. 199, 203-04, 299 P.3d 309 (2013).

The Kansas Supreme Court has long taken the position that:

> "Although it must be conceded that the jurors in a criminal case have the raw physical power to disregard both the rules of law and the evidence in order to acquit a defendant, it is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon." *State v. McClanahan*, 212 Kan. 208, 217, 510 P.2d 153 (1973).

8

Over 30 years later, in *State v. Naputi*, 293 Kan. 55, 66, 260 P.3d 86 (2011), the Kansas Supreme Court noted that it is not "the role of the courts to instruct the jury that it may ignore the rule of law." Nevertheless, Himmaugh argues that our Supreme Court has explicitly recognized the power of a jury to nullify a verdict so that "an instruction informing the jury that it must follow the law as given is an incorrect statement of the law."

It is true that our Supreme Court recently held that "a jury instruction telling the jury it 'must' or 'will' enter a verdict" was improper. *State v. Smith-Parker*, 301 Kan. 132, Syl. ¶ 6, 340 P.3d 485 (2014). The court held that the wording of such an instruction came too close to "directing a verdict for the State. A judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt." 301 Kan. at 164. But the instruction in this case did not direct the jury to enter a particular verdict. Instead, it simply instructed the jury to follow the law.

Moreover, this court has considered the exact instruction Himmaugh challenges several times recently and has determined the instruction is consistent with the Kansas Supreme Court's decisions in *McClanahan* and *Naputi*. See *State v. Amack*, No. 111,136, 2015 WL 2342371, at *5 (Kan. App. 2015) (unpublished opinion), *rev. denied* October 9, 2015; *State v. Price*, No. 112,405, 2015 WL 5311353, at *2 (Kan. App. 2015) (unpublished opinion), *petition for rev. filed* October 2, 2015. We agree with the sound reasoning of the *Amack* and *Price* decisions and find no reason to depart from them here.

Because Himmaugh's claim of error fails, it is unnecessary to go on to the second step of the *Betancourt* analysis.

9

*The district court did not err when it sentenced Himmaugh to lifetime postrelease supervision.*

Himmaugh challenges the portion of his sentence in which the judge ordered lifetime postrelease supervision, arguing that, in his case, the length of the sentence violates the United States and Kansas Constitutions' prohibitions on cruel and unusual punishment.

*§ 9 of the Kansas Constitution Bill of Rights*

Generally, appellate courts have unlimited review of constitutional challenges because such challenges give rise to questions of law. *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012). However, when a defendant challenges his or her sentence as cruel or unusual, appellate courts utilize a bifurcated standard of review. Appellate courts review district courts' factual findings to determine whether the findings are supported by substantial competent evidence. Legal conclusions are reviewed de novo. 294 Kan. at 906.

In *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978), our Supreme Court set out a framework to use when determining whether the length of a sentence violates § 9 of the Kansas Bill of Rights' prohibition on cruel and unusual punishment. The court has instructed judges to consider:

> "(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

10

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." 223 Kan. at 367.

When evaluating these factors, "'consideration should be given to each prong of the test'" so that no one factor controls. *Mossman*, 294 Kan. 908. However, "'[u]ltimately, one consideration may weigh so heavily that it directs the final conclusion.'" 294 Kan. at 908.

### *First* Freeman *Factor*

The first of the *Freeman* factors requires this court to make a case specific determination regarding the nature of the offense and the character of the offender. *Mossman*, 294 Kan. at 909. Himmaugh argues that this court should find in his favor on this factor because he was young at the time of the crime and had no criminal history. In addition, Himmaugh notes that he was neither charged with nor convicted of nonconsensual crimes.

Himmaugh was convicted of aggravated indecent liberties and indecent liberties with a child. The Kansas Legislature has determined that both are, by their very nature, sexually violent crimes. K.S.A. 2014 Supp. 22-3717(d)(1)(G)(5)(B), (C). These are statutorily violent crimes even if the facts of a given case demonstrate that the victim consented to the sexual contact. *Mossman*, 294 Kan. at 909-10. The reason for this broad categorization is the State's paramount interest in protecting children from the physical and psychological harm that results from sexual abuse. 294 Kan. at 909. In addition to the lasting harm sexual abuse has on victims, the State has determined stringent intervention is necessary because sex offenders pose a high risk of recidivism. 294 Kan. at 909-10.

11

Regarding the facts of this specific crime, Himmaugh was aware at the time of the crime that the victim was 15 years old. Himmaugh nevertheless contacted the victim and asked her to slip out of her house to meet him. Once the two were together, Himmaugh grabbed her arm and led her out of sight of her house. After they were out of sight, Himmaugh grabbed the victim's hand then exposed himself and put his penis into her hand. The victim told Himmaugh to stop and pulled her hand away. Himmaugh then forced his hand down the victim's pants and inserted at least one finger into her vagina. The victim testified that she was frightened by Himmaugh at the time of the event. The victim's mother testified that in the wake of the crime, the victim developed severe anxiety that required counseling and medication. While Himmaugh contests M.C.'s characterization of the event as nonconsensual, M.C.'s testimony indicates Himmaugh used force to assert himself upon M.C.

Little insight can be gained into Himmaugh's individual character from the record. In his favor, he was young, just 19 years old, at the time he committed the crime and had no criminal history. Weighing against those mitigating factors, the district court noted that, based on his body language, Himmaugh did not seem to understand the seriousness of the crime he had committed.

In *Mossman*, the Kansas Supreme Court upheld the imposition of lifetime postrelease supervision for a 25-year-old defendant who had a consensual sexual relationship with a 15-year-old girl. 294 Kan. at 910. The Supreme Court reasoned that regardless of the particular circumstances, Mossman's crime was one that had been deemed a violent sexual offense and that the State had an overriding interest in protecting children from such crimes. 294 Kan. at 910. Even after considering his lack of criminal history, low risk of recidivism, acceptance of responsibility, and remorse, the Supreme Court determined that the first *Freeman* factor weighed in favor of finding Mossman's sentence constitutional. 294 Kan. at 912.

In *State v. Toahty-Harvey*, 297 Kan. 101, 102, 298 P.3d 338 (2013), the defendant was convicted of aggravated indecent liberties with a child after he snuck into a 12-year-old girl's bedroom "while she was sleeping and placed his hand in the area of her genitalia, making skin-to-skin contact." On appeal, our Supreme Court rejected Toahty-Harvey's argument that his low risk of recidivism, mild manner, low IQ, and the fact that the victim was not physically harmed should cause the court to find in his favor on the first *Freeman* factor. The court again discussed the severity of the crime, the State's role in protecting children, and the fact that even if a child is not physically harmed by a sexual assault there is a high risk that the child will experience lasting psychological harm as factors that tipped the scale in favor of upholding the sentence of lifetime postrelease supervision. 297 Kan. at 107-09.

There are fewer mitigating factors at play in this case than there were in either *Mossman* or *Toahty-Harvey*. Unlike Himmaugh, Mossman accepted responsibility and showed remorse for his actions. In *Toahty-Harvey*, the defendant had a low IQ and the victim did not seem to have experienced any physical or psychological harm as a result of Toahty-Harvey's action. Nevertheless, in both cases the Supreme Court determined that the imposition of lifetime postrelease supervision was neither cruel nor unusual as applied.

The seriousness of the crime Himmaugh committed, the State's important reasons for imposing stringent punishment in cases involving child victims of sex offenses, the victim's testimony that Himmaugh forced himself on her after she told him to stop, the victim's testimony that she was afraid of Himmaugh, the lasting psychological trauma to the victim, and Himmaugh's lack of remorse all weigh in favor of finding Himmaugh's sentence constitutional. Considering the facts surrounding Himmaugh's conviction, there was sufficient evidence to support the district court's conclusion that Himmaugh's punishment was not disproportionate to his crime and we agree that the first *Freeman* factor does not weigh in Himmaugh's favor.

13

*Second and Third* Freeman *Factors*

The second and third *Freeman* factors require courts to look at the punishment being challenged as unconstitutional and compare it, first to other punishments in the same state for other crimes and then to punishments in other states for the same crime, to determine whether the sentence is grossly disproportionate. *Freeman*, 223 Kan. at 367. Because these last two factors are not case or fact specific, prior holdings regarding this issue are dispositive.

In *Mossman*, our Supreme Court conducted a detailed analysis of the *Freeman* factors as they apply to challenges to the constitutionality of sentences imposing lifetime postrelease supervision on individuals convicted of aggravated indecent liberties with a child. The court discussed Mossman's argument that there are a number of more serious offenses for which a defendant would receive a shorter period of postrelease supervision than defendants convicted of aggravated indecent liberties with a child would receive. See 294 Kan. at 912. In response to Mossman's argument that he would have received a shorter period of postrelease supervision if he had committed murder, the court acknowledged that the postrelease period was much lengthier, but counseled that the sentence should be considered as a whole. Second-degree murder has a much shorter postrelease supervision period but a much longer prison sentence than aggravated indecent liberties. Given the severe restriction prison imposes on a person's liberty compared to the burden of postrelease supervision, the court concluded that the overall severity of the sentences is not disproportionate.

> "Mossman's sentence to lifetime postrelease supervision is not grossly disproportionate in relation to the sentence applicable to second-degree murder in Kansas when we consider the penological purposes, the seriousness of the crime, and the other concerns discussed in relation to the first *Freeman* factor. In other words, the difference in proportionality between Mossman's sentence and one for second-degree murder is not so significant that the second *Freeman* factor outweighs the first *Freeman* factor." 294 Kan. at 917.

14

In its analysis of the third *Freeman* factor, the *Mossman* court examined the laws of other states to determine if the Kansas sentence for aggravated indecent liberties with a child is disproportionate to the punishment for the same crime in other states. The court found that less than half of the states impose lifetime postrelease supervision in similar cases; even fewer are as strict as Kansas, whose law does not provide a mechanism for termination of postrelease supervision under any circumstances. 294 Kan. at 920. Despite Kansas' law being more severe than the national trend, the court determined: "Kansas is not alone in imposing mandatory lifetime postrelease supervision for crimes such as Mossman's, and we are not aware of any court that has found lifetime postrelease supervision of a violent sex offender to be cruel and unusual punishment." 294 Kan. at 920. Finding that all three of the *Freeman* factors weighed in favor of upholding Mossman's sentence, the Supreme Court concluded that the imposition of lifetime postrelease supervision in Mossman's case did not violate § 9 of the Kansas Constitution Bill of Rights. 294 Kan. at 921.

Himmaugh acknowledges that his challenge mirrors Mossman's and that the *Mossman* precedent controls this court's analysis of the second and third *Freeman* factors as they apply to the sentence of lifetime postrelease supervision for aggravated indecent liberties with a child. Because the Kansas Supreme Court has conclusively determined that these factors should be decided against defendants convicted of aggravated indecent liberties with a child, and this court is duty bound to follow Supreme Court precedent, this court must find against Himmaugh on the second and third *Freeman* factors.

*Conclusion*

Kansas Supreme Court precedent regarding lifetime postrelease supervision clearly favors finding constitutionality in situations where an offender is convicted of aggravated indecent liberties with a child. See *Toahty-Harvey*, 297 Kan. 101; *State v. Ross*, 295 Kan. 424, 284 P.3d 309 (2012); *Mossman*, 294 Kan. 901. As recently as

15

September 2015, this court upheld as constitutional the imposition of lifetime postrelease supervision for a defendant convicted of aggravated indecent liberties with a child utilizing the *Freeman/Mossman* analysis. See *State v. Reyna*, No. 112,350, 2015 WL 5311918 (Kan. App. 2015) (unpublished opinion), *petition for rev. filed* October 7, 2015.

Here, all three of the *Freeman* factors weigh in favor of finding Himmaugh's sentence constitutional: the crime itself was a particularly heinous, violent crime which left the victim injured to the extent that she required medication and therapy to cope with the psychological trauma; Himmaugh demonstrated throughout the district court proceedings that he lacked remorse and did not understand the seriousness of his conviction; the sentence imposed is not grossly disproportionate to the sentences imposed for other severe crimes in Kansas; and the Kansas law imposing lifetime postrelease supervision on those convicted of aggravated indecent liberties with a child is not out of line with the punishments imposed by other states for the same crime.

Himmaugh's sentence does not violate § 9 of the Kansas Constitution Bill of Rights. Accordingly, the district court's determination is affirmed.

*The Eighth Amendment to the United States Constitution*

Himmaugh began his analysis of the constitutionality of his sentence by invoking both the United States and Kansas Constitutions' prohibitions of cruel and unusual punishment. However, he does not provide any analysis of how the Eighth Amendment applies to the facts of his case. Generally, when a party raises an issue in a brief but then fails to argue it, the issue is deemed abandoned. *State v. Llamas*, 298 Kan. 246, 264, 311 P.3d 399 (2013).

There are two types of Eighth Amendment challenges that can be made: case specific proportionality challenges and categorical proportionality challenges. See

16

*Mossman*, 294 Kan. at 921-22. Categorical proportionality challenges have typically been reserved for death penalty cases and cases involving minors being tried as adults. 294 Kan. at 926. To the extent that Himmaugh makes any argument that the Eighth Amendment bars his sentence, his is a case specific proportionality challenge.

When a defendant challenges the constitutionality of a sentence as inconsistent with the Eighth Amendment, courts are to "'compar[e] the gravity of the offense and the severity of the sentence. [Citation omitted.]'" *Mossman*, 294 Kan. at 922. When making this comparison courts should consider "'a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by his conduct, and any prior criminal history. [Citation omitted.]'" 294 Kan. at 923. If the court finds that this comparison "'"leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.'" 294 Kan. at 922. In this way, the second two steps of the analysis track the *Freeman* test, but they are only considered if the first step of the test weighs in the defendant's favor. If analysis of the second two factors leads the court to believe that the sentence is grossly disproportionate, then the sentence is cruel and unusual. 294 Kan. at 922. Our Supreme Court has cautioned that "it is only the rare case where the Eighth Amendment threshold comparison of the gravity of the offense and the harshness of the penalty will lead to an inference of gross disproportionality," so in most cases, the second two factors will not be considered. 294 Kan. at 923.

As discussed above, Himmaugh's crime is one that the legislature views as especially heinous, categorizing it as a violent crime even when no force is actually used. Victims of sex crimes are likely to experience psychological trauma even when there is no physical injury. Additionally, sex offenders run a high risk of recidivism. In this particular case, Himmaugh did exert at least some force over the victim so that she was afraid of what might happen. Even after the victim asked him to stop, Himmaugh

continued to make sexual advances. The victim suffered psychological trauma as a result of Himmaugh's crime. Taking all of these factors into account, the sentence imposed does not seem overly severe. As a result, Himmaugh's Eighth Amendment challenge fails.

Affirmed.