NOT DESIGNATED FOR PUBLICATION

No. 115,625

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT F. DWERLKOTTE, JR.,
*Appellant.*

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed April 28, 2017. Affirmed.

*Shannon S. Crane*, of Hutchinson, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MALONE and GARDNER, JJ.

*Per Curiam*:  In this appeal, Robert F. Dwerlkotte, Jr., appeals the district court's ruling modifying his sentence to include lifetime postrelease supervision. In a companion appeal (No. 116,231), we address the issues he raises about his criminal history score. In this case, we focus on Dwerlkotte's claim that a sentence with lifetime postrelease supervision is disproportionate because of the nature of his crime and his character. For reasons explained in the opinion, we conclude that it is not cruel and unusual punishment for the court to place Dwerlkotte on lifetime postrelease supervision.

1

*Dwerlkotte pled no contest to two serious felony crimes.*

In 2007, Dwerlkotte pled no contest to aggravated burglary, a severity level 5 person felony, and guilty to aggravated sexual battery, a severity level 5 person felony. After the court found that Dwerlkotte was a persistent sex offender it sentenced him to 272 months in prison and 24 months' postrelease supervision.

Eight years later, the State moved to correct an illegal sentence, arguing that at the time of Dwerlkotte's offense, K.S.A. 22-3717(d)(1)(G) and (d)(5) required the court to impose a sentence of lifetime postrelease supervision. At the hearing on this motion Dwerlkotte argued that postrelease supervision was cruel and unusual punishment, citing the "*Freeman* factors." The court granted the State's motion over Dwerlkotte's objection and imposed a sentence of lifetime postrelease supervision. We pause to discuss an important case dealing with this point.

Fundamentally, both § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution provide that "cruel and unusual [p]unishment[s]" shall not be inflicted. The bellwether case on this point is *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). The *Freeman* court held that "[p]unishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." 223 Kan. at 367.

In determining whether the length of a punishment is impermissible under § 9 of the Kansas Constitution Bill of Rights, Kansas courts now analyze three factors, known as the "*Freeman* factors":

> "(1) The nature of the offense and the character of the offender should be
> examined with particular regard to the degree of danger present to society; relevant to this

2

inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the peneological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." *Freeman*, 223 Kan. at 367.

In considering the *Freeman* factors, courts consider each factor; no one factor controls. *State v. Cameron*, 294 Kan. 884, 890, 281 P.3d 143 (2012). Dwerlkotte limits his argument to the first *Freeman* factor. We confine our review to that factor alone.

*The district court made findings about the first* Freeman *factor.*

This factor requires the court to consider two things: the nature of the offense and the character of the offender with particular regard to the degree of danger present to society. When making this analysis, courts can consider the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the peneological purposes of the prescribed punishment. *Freeman*, 223 Kan. at 367.

The district court made factual findings on the terrible impact this crime had upon the victim:

"At the time of the sentencing in this case Mr. Dwerlkotte was a criminal history score A. He had a prior criminal conviction for aggravated indecent solicitation of a child. The victim testified, or made a statement at sentencing in this case and certainly she was the ex-wife of the defendant, but being the ex-wife of a defendant does not allow someone to be less culpable or responsible for criminal acts.

3

"The victim in the case quite—and I recall her statements personally—very eloquently spoke of the mental anguish and emotional damage that had been inflicted upon her by the defendant and certainly it had been an ongoing situation with basically a stalking situation. But ultimately her house was broken into in the middle of the night in which she was sexually attacked by the defendant. As happens with a great number of people whose homes are burglarized, the victim particularly and very appropriately addressed to the court her feelings that she felt safe nowhere in the world now because if you can't be safe in your own residence there's no place that you can be safe.

"While these offenses were occur[ing], a 2-year-old child was in the house. There's, at that point was some question as who the father was but that has been determined by a different court in regards to that issue. But the child also, in the court's view, was placed in danger.

"The court under the facts of the crime dealing with the harm, the repeat criminal activities of the defendant over an extensive period of time, and with particular regard of the degree of danger to society, finds that the punishment of a lifetime postrelease . . . does not constitute a violation of the Eighth Amendment as cruel and unusual punishment."

Our review of the record reveals that the district court's factual findings are supported by substantial competent evidence. At his plea hearing, Dwerlkotte admitted that he unlawfully touched the victim, his ex-wife, with the intent to arouse or satisfy his sexual desires while she was overcome by force or fear. Then, at the sentencing hearing, the victim testified that Dwerlkotte broke into her apartment. She described several break-ins and incidents of harassment by Dwerlkotte. She described the emotional trauma Dwerlkotte caused her, the inability to eat or sleep, the great security measures she took in order to feel safe, and how she now has to constantly look over her shoulder. Finally, Dwerlkotte had prior convictions for aggravated indecent solicitation of a child, harassment by telephone, three counts of burglary, criminal trespass, and disorderly conduct, among others.

4

In turn, the court's factual findings also support its legal conclusion that the first *Freeman* factor weighs against Dwerlkotte. Dwerlkotte committed a serious crime. He broke into his ex-wife's house and sexually attacked her. This was part of a continuing course of violent conduct he was exhibiting toward his ex-wife. These facts can only lead to a very negative inference about his character. Moreover, Dwerlkotte had a prior conviction for a sexually violent offense.

The peneological purposes of lifetime postrelease supervision weigh in favor of imposition of the lifetime postrelease supervision component of his sentence. In *State v. Mossman*, 294 Kan. 901, 908, 281 P.3d 153 (2012), the defendant was convicted of aggravated indecent liberties with a 15-year-old victim. Mossman contended his character did not support a sentence of lifetime postrelease supervision because an assessment concluded he had a low risk of recidivism, he had no criminal history, he accepted responsibility, and he had shown remorse for his crime. But our Supreme Court found the arguments unpersuasive because postrelease supervision has other legitimate peneological goals than punishment or retribution. Postrelease supervision is designed to deter and rehabilitate sex offenders. 294 Kan. at 911. Supervised release can also incapacitate sex offenders because they are kept under the "watchful eye" of probation officers. *Cameron*, 294 Kan. at 898. Rehabilitation and incapacitation are critical goals of the criminal justice system given the propensity of sex offenders to reoffend. *Mossman*, 294 Kan. at 930.

Such goals seem appropriate for Dwerlkotte as well. His violent crime, the continuing violence towards his ex-wife, his prior sex offense, and his conviction for telephone harassment all lead toward a reasonable conclusion that Dwerlkotte indeed does need the "watchful eye" of probation officers.

Moving on, we note that Dwerlkotte contends that his criminal history score should have been C because his prior burglary convictions were improperly scored as

person crimes. He argues that his criminal history score made a huge difference in the court's evaluation of his character.

While we have held in case No. 116,231 that Dwerlkotte is correct that his criminal history was scored incorrectly, we are not convinced that sentencing error helps him on this point. There are two problems with Dwerlkotte's argument. First, the court only briefly mentioned that Dwerlkotte's criminal history score was A. It seems to us that the court was more concerned with, and only specifically mentioned, Dwerlkotte's prior conviction for aggravated indecent solicitation of a child. From the judge's words, there is no indication in the record that the scoring of Dwerlkotte's prior burglary convictions as either person or nonperson crimes had *any* effect on the district court's evaluation of Dwerlkotte's character.

Second, lifetime postrelease supervision was the statutorily mandated sentence for Dwerlkotte's crime no matter what his criminal history score was. The court was required by law to impose that component of his sentence.

*We consider two mitigating factors.*

Dwerlkotte also raises two mitigating factors:
- that he was intoxicated at the time of his crime; and
- that the State agreed in the plea agreement not to ask the sentencing court to declare Dwerlkotte a persistent sex offender.

The district court found that Dwerlkotte's intoxication was not legally sufficient to mitigate a sentence of lifetime postrelease supervision. Indeed, in *Cameron*, 294 Kan. at 892, our Supreme Court did not weigh the first *Freeman* factor in the defendant's favor even though alcohol was viewed as "a significant causative factor" in the defendant's sex

6

offense. Here, we remain unconvinced that Dwerlkotte's voluntary intoxication mitigates his violent crime at all. His continued course of violent and invasive conduct with his former wife is not lessened because he says he was drunk on this occasion. We see no error here.

Next, the district court acknowledged that the State agreed in the plea agreement not to ask for a persistent sex offender finding. Even so, the court stated that Dwerlkotte met the qualifications under the statute and found that Dwerlkotte was a persistent sex offender. This court has previously upheld the district court's finding that Dwerlkotte was a persistent sex offender in prior appeals. See *State v. Dwerlkotte*, No. 109,930, 2014 WL 1707965 (Kan. App. 2014) (unpublished opinion), *rev. denied* 301 Kan. 1048 (2015); *Dwerlkotte v. State*, No. 105,669, 2011 WL 4906854 (Kan. App. 2011) (unpublished opinion); *State v. Dwerlkotte*, No. 99,581, 2009 WL 500992 (Kan. App. 2009) (unpublished opinion). We will not alter that ruling in this case. Just because the State did not ask for a persistent sex offender finding does that mean the court could not find Dwerlkotte to be such under Kansas law. Thus, the peneological goals of lifetime postrelease supervision support its imposition here.

Lifetime postrelease supervision is not so disproportionate to Dwerlkotte's crime that it shocks the conscience or offends fundamental notions of human dignity. Nor is lifetime postrelease grossly disproportionate for Dwerlkotte's crime. Given the seriousness of Dwerlkotte's crime, the emotional trauma to the victim, that Dwerlkotte is a persistent sex offender, and the peneological purposes of postrelease supervision, the district court did not err in concluding that lifetime postrelease supervision in this case was constitutional under § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution.

Affirmed.