NOT DESIGNATED FOR PUBLICATION

No. 119,499

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHACE ANTHONI JACKSON,
*Appellant*.


MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed August 9, 2019.
Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before HILL, P.J., STANDRIDGE, J., and NEIL B. FOTH, District Judge, assigned.


PER CURIAM: Chace Anthoni Jackson pled guilty to criminal sodomy and aggravated indecent liberties with a child. The district court sentenced him to 161 months' imprisonment with lifetime postrelease supervision. On appeal, Jackson argues the district court's decision to impose lifetime postrelease supervision amounts to cruel and unusual punishment under § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. For the reasons stated below, we affirm the decision of the district court.

FACTS

Jackson met the victim, L.V., in February 2017. Jackson began texting L.V. on November 28, 2017, just days after her 15th birthday. In these texts, Jackson encouraged L.V. to sneak out of her family home to see him, enticing her with alcohol and marijuana. On November 30, 2017, they had the following text message exchange:

"[Jackson:]    'Hurry and get that booty over here.'
"[L.V.:]        'Can[']t.'
"[Jackson:]    'You can . . . You are more th[a]n welcomed over lol just don[']t get
                caught.' . . . 'I got liq and tree. Plus back rubs or what not.'"

L.V. ultimately agreed to sneak out to meet Jackson, who picked her up and took her to the house in which he lived in the basement.

While in the basement, Jackson provided L.V. with marijuana and the two of them smoked "'a bowl of weed together.'" Jackson also offered her alcohol, but she refused. After kissing L.V. on her neck and breasts, Jackson sexually assaulted L.V. The first time Jackson penetrated her, he did not wear a condom. The second time Jackson penetrated her, he wore a condom. When Jackson was done, L.V. told Jackson she needed to go home. They both got dressed, and Jackson drove L.V. home.

The next day, L.V. went to Salina Regional Health Center and reported the sexual assault. She provided Jackson's first name and a description of his house to detectives. When Detectives Chris Venables and Andrew Zeigler went to the address, Jackson answered the door. The detectives explained why they were there and asked to see the basement. The basement was as L.V. had described, and the detectives saw marijuana and paraphernalia in plain sight. The detectives informed Jackson of his *Miranda* rights. He confirmed that he understood his rights. Jackson also informed the detectives that he had more marijuana. The detectives requested permission to search the basement, and

Jackson provided his consent. The detectives arrested Jackson and transported him to the police department.

Although characterizing it as sexual intercourse instead of sexual assault, Jackson confirmed the underlying facts provided by L.V. in her report. He added that he committed an act of oral sex on L.V. before having sexual intercourse with her. Jackson told detectives he thought L.V. was 15 or 16 years old. During the interview, Jackson allowed the detectives to look at the messages on his phone. The detectives discovered a text message in which L.V. informed Jackson that she was 15 years old, to which he replied, "'I know.'"

The State charged Jackson with indecent liberties with a child, criminal sodomy, three counts of aggravated indecent liberties with a child, contributing to a child's misconduct or deprivation, two counts of possession of drug paraphernalia, possession with intent to distribute a controlled substance, and unlawful possession of marijuana.

Pursuant to a plea agreement, Jackson pled guilty to one count each of criminal sodomy and aggravated indecent liberties with a child, both severity level 3 person felonies. In return for his agreement to enter guilty pleas, the State agreed to recommend the district court sentence him to the mitigated sentence in the grid box and run the two sentences concurrently. The State also agreed that Jackson would be free to ask for a lesser sentence.

Before sentencing, Jackson filed two motions. In the first motion, Jackson requested a durational departure from the presumptive prison sentences on the sentencing grid for each of the crimes of conviction. In the second motion, Jackson argued that imposition of lifetime postrelease supervision as required under K.S.A. 2018 Supp. 22-3717 for each of the crimes of conviction would violate his constitutional right to be free

3

from cruel and unusual punishment as guaranteed by the Kansas Constitution Bill of Rights and the Eighth Amendment.

The district court heard argument on both motions at the sentencing hearing. Regarding the constitutionality of lifetime postrelease supervision, the court considered written pleadings submitted by the parties on the issue, the law enforcement affidavit provided to the court as the factual basis for Jackson's guilty pleas, and the written victim impact statement submitted by L.V. to the court. After hearing arguments from counsel, the court ultimately ruled that imposing lifetime postrelease supervision in this case would not result in a punishment that was cruel or unusual under the Kansas Constitution Bill of Rights or the Eighth Amendment.

Regarding the request for durational departure, the district court considered the documentation identified above and the testimony of Jackson, L.V., and L.V.'s mother. In his testimony, Jackson was generally apologetic to L.V., her family, and his family but appeared to minimize the gravity of his crimes and the severity of the punishment he faced. While he claimed to accept responsibility for the sexual assaults he committed, he blamed substance abuse, mental health issues, and a poor upbringing for his actions. Jackson told the court that he had not realized things were getting out of hand that night and "[he understood] now that [his] actions were wrong, but there was no sign of struggle or anything else that was stating that this was anything more than, you know, um, consensual." Jackson commented to the court that everybody makes mistakes and that all he wanted was a chance to make things better, to make it up to his family, and to use his experience to help prevent others from making "careless mistakes."

L.V. read her victim impact statement, which the district court already had incorporated into its analysis on the constitutionality of lifetime postrelease supervision. She said she believed Jackson was 22 years old and he waited until she was so high that she could not speak or move. L.V. said she suffered from severe depression and anxiety.

4

She had been hospitalized three times following this incident: twice for suicidal ideation and once following a suicide attempt. She blamed Jackson for being tormented by peers. L.V. told the court "[i]t was not indecent liberties. This was no Romeo and Juliet; this was rape." She asked the court to imprison Jackson to the fullest extent of the law.

L.V.'s mother provided additional insight to the adverse effects L.V. suffered as a result of Jackson's sexual assault on her daughter. In junior high school, L.V. was on the honor roll, was in Girl Scouts, was in debate, and was active in sports and extracurricular school activities, including orchestra. L.V. was outgoing and had many friends. She even volunteered as a page for a state senator several times. After the sexual assault, L.V.'s mother said L.V.'s grades declined because she was unable to sit through classes; at that point, they were just hoping she passed. L.V. lost many of her friends and had been bullied and harassed to the point that law enforcement became involved. L.V. suffered from depression and suicidal thoughts. She quit sports and orchestra and was in weekly counseling. Her mother was seeking additional counseling just to help L.V. survive each day. Like L.V., her mother asked the district court to impose the most severe sentence possible.

Based on the evidence presented and the arguments of counsel, the district court found the totality of circumstances did not support a durational departure. In support of its finding, the court stated it considered Jackson's guilty pleas and the recommendations of the parties, as well as the sentence he could have received absent the plea deal. Regarding Jackson's statement, the district judge stated:

> "It was very disconcerting to hear that at the time he didn't understand that it was getting out of hand. He used the term consensual. It is almost shocking to the Court to think that there would be someone walking around in this community who is in his late twenties who thinks that at any point a sexual encounter would be appropriate with a 15-year-old and that it would in any way come to the point of getting out of hand. It was out of hand the moment the text was sent, period. The moment there was contact at all it was out of

5

hand. And people in this community should be able to walk down the street with their sons and daughters without having to wonder if there is a 27-year-old man walking by that is sexually interested and going to pursue their 15-year-old daughter. It is completely inappropriate, it is illegal and it was never in hand and the Court is very concerned that the defendant does not understand that. It was not consensual based upon the age of this victim in the Court's view."

The district court found Jackson completely disregarded L.V.'s feelings, her family's emotions, and her safety in order to satisfy his sexual desires. The court considered Jackson's offense to be "an intentional predatory pursuit of a young lady, a teenager." The district court imposed consecutive sentences, for a controlling sentence of 161 months' imprisonment with lifetime postrelease supervision.

ANALYSIS

On appeal, Jackson argues the district court violated his state and federal constitutional right to be free from cruel and unusual punishment by sentencing him to lifetime postrelease supervision under the statutory mandate set forth in K.S.A. 2018 Supp. 22-3717. The constitutionality of a sentencing statute is a question of law subject to unlimited appellate review. *State v. Hilt*, 299 Kan. 176, 202, 322 P.3d 367 (2014).

A statute is presumed constitutional and all doubts must be resolved in favor of its validity. *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014). Due to the separation of powers principle, "if there is any reasonable way to construe a statute as constitutional, courts have the duty to do so by resolving all doubts in favor of constitutionality." *State v. Mossman*, 294 Kan. 901, 906-07, 281 P.3d 153 (2012).

When a defendant challenges his or her sentence as cruel and unusual, appellate courts use a bifurcated standard of review: "All of the evidence is reviewed, but not reweighed, to determine whether it is sufficient to support the district court's factual

6

findings, but the legal conclusions that the district court draws from those facts are reviewed de novo." *State v. Ross*, 295 Kan. 424, 425-26, 284 P.3d 309 (2012).

1. *Section 9 of the Kansas Constitution Bill of Rights*

Section 9 of the Kansas Constitution Bill of Rights prohibits cruel and unusual punishment. Even when the method of punishment may not be cruel or unusual, the constitutional prohibition against cruel and unusual punishment in the Kansas Bill of Rights also applies to punishments that are so disproportionate to the offense that it "'shocks the conscience and offends fundamental notions of human dignity.'" *State v. Funk*, 301 Kan. 925, 933, 349 P.3d 1230 (2015).

On appeal, Jackson claims that the district court's decision to impose lifetime postrelease supervision as required under K.S.A. 2018 Supp. 22-3717 resulted in him receiving a punishment that is unconstitutionally disproportionate to his crimes of conviction. The specific section of the statute alleged by Jackson to be unconstitutionally disproportionate requires a person 18 years of age or older who is sentenced to prison for committing a sexually violent crime to serve a mandatory period of lifetime postrelease supervision upon release from prison. K.S.A. 2018 Supp. 22-3717(d)(1)(G)(i). Both of the offenses to which Jackson pled guilty here—criminal sodomy and aggravated indecent liberties with a child—are expressly defined in the statute as "sexually violent crime[s]." K.S.A. 2018 Supp. 22-3717(d)(5)(C) and (D).

When determining whether a sentence is unconstitutionally disproportionate to the crime for which it was imposed, Kansas courts consider the three factors set forth by our Supreme Court in *State v. Freeman*, 223 Kan. 362, 574 P.2d 950 (1978):

> "(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this

7

inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." 223 Kan. at 367.

No single factor is controlling. Appellate courts consider the factors collectively, but one factor may "weigh so heavily that it directs the final conclusion." *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008).

a. *The first* Freeman *factor*

Analysis under the first *Freeman* factor requires the court to consider the nature of the offense and the character of the offender, with particular regard to the degree of danger presented to society. *Ross*, 295 Kan. at 426. The considerations under this factor are "inherently factual, requiring examination of the facts of the crime and the particular characteristics of the defendant." *Ortega-Cadelan*, 287 Kan. at 161. In addition, the court "may consider the offender's mental state and motive in committing the crime, the actual harm caused to the victim or to society by the offender's conduct, any prior criminal history of the offender, and the offender's propensity for violence." *Ross*, 295 Kan. at 429.

(1) *Nature of the offenses*

The district court found that criminal sodomy and aggravated indecent liberties with a child are violent by nature and sexually motivated. The court noted that the egregious nature of the offenses was exacerbated by the fact that Jackson repeatedly

pressured L.V. to sneak out of her house to meet him, first by enticing her and then by inducing her to smoke marijuana, which rendered L.V. even more vulnerable than she would have been had the offense been committed based solely on her young age. The court also found the 11-year age difference between Jackson and L.V. to be significant.

(2) *The offender's character and degree of culpability*

In considering Jackson's character, including his mental state and motive in committing the crimes here, the court found that 26-year-old Jackson intentionally lured L.V., who he knew was only 15 years old, to sneak out of her house with repeated promises to provide illegal drugs and romance. With regard to both character and culpability, the district court found Jackson was "very determined in pursuing the commission of this offense to the extent of separate text messages, communications, et cetera over the course of more than one day before finally obtaining agreement to have the victim sneak out of her house." The court determined this was not a spur of the moment plan but a calculated and deliberate plan that was executed over a period of days.

The district court also found that Jackson knew L.V. was significantly vulnerable because of her age and level of intoxication and that Jackson intentionally took advantage of her vulnerability. The court found Jackson's mental state was predatory,

> "purely geared towards self-gratification with the end goal being his physical pleasure at the cost of that girl's innocence in whatever sense the—as far as physical and time and her age, all the safety physical emotional innocence, psychological well-being, all of that, was at stake for his own gratification."

(3) *The degree of harm experienced by the victim and by society*

Regarding actual harm, the district court referred to L.V.'s victim impact statement, which included a narrative describing the adverse effects she had experienced

9

as a result of the sexual crimes committed against her by Jackson. According to L.V., these lingering adverse effects include severe depression, anxiety, suicidal thoughts, suicide attempts, and torment by peers and others. In her statement, L.V. emphasized that the numerous mental health challenges she had experienced, and was continuing to experience, were directly caused by the sexual crimes Jackson committed against her, especially after she found out he was 26 years old at the time. The district court emphasized the adverse effects experienced by the victim as a result of Jackson's sexual offenses: "The severe depression, anxiety, suicidal thoughts, suicidal ideations but acting out on that, that she's been tormented by both peers and others because of this incident." The court again referred to the three-page victim impact statement by acknowledging the physical and psychological trauma experienced by L.V. as a result of Jackson's crimes.

Regarding harm to society, the district court found that sexual offenses like the ones committed here cause a ripple effect in the community. The court found Jackson's sexually violent offenses not only harmed the life of the victim here but also caused great harm to the victim's family, friends, and community. The court also noted that any family the victim may have in the future also will be adversely impacted.

The district court concluded "the actual harm caused to this victim and to society by this defendant's predatory conduct does not justify finding gross disproportionality on that factor."

(4) *Prior criminal history of the offender*

In reviewing Jackson's criminal history, the district court identified 10 prior convictions in the presentence investigation report, including an adjudication as a juvenile. His criminal history included possession of marijuana as a juvenile, two counts of no proof of insurance, no driver's license, burglary of a dwelling, two counts of attempted vehicular burglary, interference with law enforcement, possession of marijuana

10

with intent to distribute, and possession of drug paraphernalia. The court found his extensive criminal history did not provide support for Jackson's claim that imposition of lifetime postrelease supervision is a punishment that is wholly disproportionate to his crimes of conviction. In fact, the district court noted that Jackson's criminal history reflected an escalation of unlawful conduct and a significant history of illegal drug use, all of which appeared to culminate in a 26-year-old Jackson raping a 15-year-old girl while she was under the influence of a psychoactive illegal drug provided to her by Jackson.

### (5) *Penological purposes of the prescribed punishment*

With regard to the penological purposes of lifetime postrelease supervision, the district court found a significant public safety interest in requiring a longer term of supervision for individuals who prey on vulnerable children by supplying them with illegal drugs in order to facilitate the commission of a sexually violent offense against them. The court also referenced the high rate of recidivism for convicted sex offenders as a penological goal. To that end, the court stated:

> "[P]ostrelease supervision is designed to deter future crime and in the case of sexual offenders this is particularly relevant considering the high rate of recidivism, which is also recognized in the very logical and significant change in the rules of evidence under [*State v.*] *Prine*[, 287 Kan. 713, 200 P.3d 1 (2009),] noting that propensity is a valid admissible basis for that type of evidence because the prior act of sexually offending on a minor can be used to show the propensity to commit that crime in the future.
>    "... It also helps incapacitate the offender[s] to some extent by keeping them under supervision by court officers who may be able to detect problems such as evidence of being around minors when they shouldn't be or accessing pornography when they shouldn't be, those types of examples, can help incapacitate and prevent future offenses."

In light of its factual findings as set forth above, the district court concluded as a matter of law that the first *Freeman* factor supported a sentence of lifetime postrelease supervision. On appeal, Jackson challenges several of the district court's findings.

First, Jackson "takes issue" with the district court's finding that L.V. "finally relent[ed]" to his offers of marijuana and physical intimacy, that he was the only person responsible for committing the offenses, that the offenses were violent and sexually motivated, and that L.V.'s victim impact statement was truthful. In support of this challenge to the court's findings of facts, Jackson argues there is no evidence to establish that the offenses were committed with actual physical force, the factual basis supporting his guilty plea made no mention of L.V. feeling drugged, and the court failed to consider the fact that L.V. let him pick her up and take her to his house, where she knowingly smoked marijuana even though she was fully aware he had texted her about her "'booty'" and "'back rubs or what not.'" Jackson also argues the court failed to consider four factors he submitted were favorable to him:

> "1) he immediately 'cooperated with law enforcement and confessed to his wrongdoing';
> 2) he had no prior history of sex offenses or related behavior, including no history of
> 'unwanted, unlawful or offensive touching'; 3) he is a victim of childhood sexual abuse;
> and 4) he had been successful on previous probation supervision."

Jackson's arguments are no more than an invitation to reweigh the evidence, which we cannot do. We have reviewed, but not reweighed, all of the evidence set forth in the record on appeal—including those facts alleged by Jackson that are supported by the record—and find the evidence is sufficient to support the district court's factual findings with regard to the first *Freeman* factor.

12

b. *The second* Freeman *factor*

The second *Freeman* factor directs the court to compare the punishment for Jackson's offense with punishments imposed in Kansas for more serious offenses. See *Mossman*, 294 Kan. at 912. If the review reveals more serious crimes are punished less severely than Jackson's offense, then "the challenged penalty is to that extent suspect." See *Freeman*, 223 Kan. at 367. The district court considers whether the sentence imposed on the defendant is grossly disproportionate in relation to the sentence for the more serious offense, considering the penological purposes of the sentence under review, the seriousness of defendant's crime, and other considerations under the first *Freeman* factor. See *Mossman*, 294 Kan. at 917.

As a preliminary matter, Jackson argues that—at least for comparison purposes under the second *Freeman* factor—the statutory punishment of lifetime postrelease supervision is essentially a life sentence. At best, Jackson contends a sentence of lifetime postrelease supervision subjects him to restrictions on his liberty for the rest of his life. At worst, Jackson contends that the Kansas Prisoner Review Board has the discretion to impose lifetime imprisonment if he commits a new felony or misdemeanor while on lifetime postrelease supervision. See K.S.A. 2018 Supp. 75-5217(c) and (d). But our Supreme Court previously has rejected the manner in which Jackson has framed the lifetime postrelease supervision. See *Funk*, 301 Kan. at 938. Specifically, the *Funk* court noted it already had "disavowed considering what might happen if a defendant happens to commit a subsequent felony" while on lifetime postrelease supervision. 301 Kan. at 938. The *Funk* court then pointed out that in *Mossman*, it had distinguished "between the potential consequences for violating postrelease supervision conditions by committing [a] new felony and those for the crime actually committed, *i.e.*, imposition of lifetime postrelease supervision." *Funk*, 301 Kan. at 938 (citing *Mossman*, 294 Kan. at 915-16). Thus, for comparison purposes here, we consider only the punishment of lifetime postrelease supervision that was imposed by the court.

13

In support of his argument, Jackson alleges that the punishment of lifetime postrelease supervision for criminal sodomy and aggravated indecent liberties with a child is grossly disproportionate to the punishment of 36 months' postrelease supervision for voluntary manslaughter. We are not persuaded by Jackson's comparison because voluntary manslaughter is classified by the Kansas Legislature as a severity level 3 person offense, which is the same severity level classification assigned to criminal sodomy and aggravated indecent liberties with a child, Jackson's crimes of conviction. The second *Freeman* factor requires comparison to a more serious offense, not one of equal severity. The Kansas Legislature has designated the seriousness of offenses through the severity level and corresponding sentence. A comparison to the punishment for voluntary manslaughter does not comply with the *Freeman* requirement.

Even if Jackson had compared his crimes to a more serious crime, our Supreme Court consistently has rejected the argument that the fact more serious crimes have shorter postrelease supervision terms in Kansas means that the imposition of lifetime postrelease supervision for child sex crimes is a disproportionate punishment. See *Funk*, 301 Kan. at 941-42; *State v. Toahty-Harvey*, 297 Kan. 101, 109, 298 P.3d 338 (2013); *State v. Cameron*, 294 Kan. 884, 892-93, 281 P.3d 143 (2012). Absent some indication our Supreme Court is departing from its previous position, this court is duty bound to follow our Supreme Court precedent. *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011).

The district court did not err in determining that a term of lifetime postrelease supervision is not grossly disproportionate to the sentence imposed for other arguably more severe offenses in Kansas.

*c. The third* Freeman *factor*

Finally, we compare the challenged punishment with punishments in other jurisdictions for the same offense. Jackson focuses not on other states' punishment for his crime but on a survey conducted by the *Mossman* court of other jurisdictions' use of postrelease supervision to punish sex offenders as a class. In its discussion, the *Mossman* court performed an extensive analysis of sentencing schemes permitting lifetime postrelease supervision for sex crimes. 294 Kan. at 917-19. And the court noted a number of cases in other jurisdictions holding that lifetime postrelease sentences imposed under these schemes did not constitute cruel and unusual punishment. 294 Kan. at 919-20. After this review, the *Mossman* court concluded:

> "[I]t seems fair to say that less than half of states provide for lifetime postrelease supervision of some or all sex offenders and, because several states have a mechanism for termination of the postrelease supervision under certain conditions, only a handful of states impose punishment as absolute as Kansas' requirement. Nevertheless, Kansas is not alone in imposing mandatory lifetime postrelease supervision for crimes such as Mossman's, and we are not aware of any court that has found lifetime postrelease supervision of a violent sex offender to be cruel and unusual punishment." 294 Kan. at 920.

See also *Cameron*, 294 Kan. at 893-95 (applying *Mossman* analysis of third factor to lifetime postrelease supervision imposed for aggravated indecent solicitation of a child). The same analysis applies here, and Jackson failed to make a more targeted argument by citing to penalties for the same crime.

d. *Weighing all three* Freeman *factors*

On balance, Jackson's crimes were serious ones, and sex offenses against a minor historically have been treated as violent felonies without regard to whether physical force was used to commit them. Jackson's mitigating claims about the nature of the crimes, his

15

culpability, and the degree of harm to both the victim and society are not supported by evidence or factual findings. Moreover, Jackson presented no evidence of mitigating facts about his character.

Finally, the second and third *Freeman* factors do not indicate Jackson's lifetime postrelease supervision sentence is grossly disproportionate to sentences for more serious Kansas offenses or for similar conduct outside our jurisdiction. The seriousness of Jackson's crimes and the legitimate penological goals that the lifetime postrelease supervision period advance "outweigh the lack of strict proportionality with other sentences in Kansas and other jurisdictions, especially given that the sentence is not grossly disproportionate." *Mossman*, 294 Kan. at 921. Because of this, the punishment of lifetime postrelease supervision for criminal sodomy and aggravated indecent liberties with a child is not so disproportionate so as to shock the conscious or offend fundamental notions of human dignity. See *Toahty-Harvey*, 297 Kan. 101, Syl. ¶ 3; *Freeman*, 223 Kan. at 367. Therefore, we conclude Jackson's lifetime postrelease supervision term does not constitute cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights. See *Mossman*, 294 Kan. at 921.

2. *Eighth Amendment to the United States Constitution*

Jackson also claims that his sentence is unconstitutional under the Eighth Amendment. There are two types of challenges under the Eighth Amendment: (1) a case-specific challenge that the sentence is disproportionate "given all the circumstances in a particular case," *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); and (2) a categorical challenge "that an entire class of sentences is unconstitutionally disproportionate given the severity of the sentence, the gravity of the crime, and the type of offender." *United States v. Williams*, 636 F.3d 1229, 1233 (9th Cir. 2011). Jackson challenged the constitutionality of his sentence only as applied to his case,

16

and he acknowledges that the test for an as-applied challenge under the Eighth Amendment is virtually identical to the *Freeman* analysis discussed above.

For the reasons stated above, Jackson failed to establish that imposition of lifetime postrelease supervision was unconstitutional under either § 9 of the Kansas Constitution Bill of Rights or the Eighth Amendment as applied to his case. The district court did not err.

Affirmed.